STATE of Missouri,
Plaintiff-Respondent,

v.

John F. DEES, Defendant-Appellant.

No. 12432.

Missouri Court of Appeals,
Southern District,
Division Three.

July 23, 1982.

Motion for Rehearing Overruled and to Transfer to Supreme Court Denied Aug. 16, 1982.

Application to Transfer Denied Oct. 18, 1982.

John D. Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Frederick H. Mayer, Thomas B. Weaver, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, for defendant-appellant.

PER CURIAM.

A jury found defendant John Dees guilty of burglary (§ 569.160)[1] and rape (§ 566.-030.1), and he was sentenced to 35 years' imprisonment for the rape and 10 years for the burglary, the sentences to run concurrently. Defendant appeals.

Defendant's first point is that the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence for the reason that the evidence was insufficient to support the convictions. In ruling that contention this court must view the evidence in the light most favorable to the state, accept all substantial evidence and all legitimate inferences fairly deducible therefrom tending to support the verdict, and reject contrary and contradictory evidence. *State v. Petrechko*, 486 S.W.2d 217 (Mo.1972). The defendant offered the testimony of himself and other witnesses and thus the submissibility of the case will be determined upon all of the evidence. *State v. Sykes*, 372 S.W.2d 24, 25[2] (Mo.1963).

In a circumstantial evidence case, the state is required to prove facts and circumstances consistent with each other and with the guilt of the defendant and inconsistent with any reasonable theory of his innocence, *State v. Keller*, 471 S.W.2d 196, 197[1] (Mo. 1971), but the circumstances need not demonstrate an absolute impossibility of innocence. *State v. Phillips*, 452 S.W.2d 187, 189[2] (Mo.1970). A defendant is not entitled to a judgment of acquittal because of discrepancies or conflicts in the testimony of the state's witnesses. *State v. Cox*, 478 S.W.2d 339, 341[3] (Mo.1972). The fact that the testimony of a witness may to some extent be contradictory does not bar it from being substantial evidence. Inconsistencies in testimony are questions for jury resolution. *State v. Hodges*, 537 S.W.2d 886, 887 (Mo.App.1976).

Defendant does not challenge the adequacy of the evidence to show that the victim was raped on the occasion in question and that her apartment was burglarized. The defect, so defendant argues, is that the evidence is insufficient to identify defendant as the rapist.

In the early morning hours of Wednesday, November 26, 1980, the victim, Kay Ogborn, a 34-year-old divorcee, was asleep in the bedroom of her apartment located at 415 Sheridan Drive, Apartment G, Cape Girardeau, Missouri. Occupying the same bed was her 12-year-old son Derek. At 3:20 a. m. Mrs. Ogborn awoke and saw a man, holding a flashlight, standing over her. Neither Mrs. Ogborn nor Derek, who was awake but "played possum," was able to see the man's face but they did observe his approximate height and weight, and Derek noted the fact that he had a moustache and beard. The man had a dark "sock cap" pulled down close to his eyebrows. The intruder put his hand over Mrs. Ogborn's mouth and ordered her not to scream or struggle. The man escorted Mrs. Ogborn downstairs to her small bathroom where the rape occurred.

1. All references to statutes are to RSMo 1978, V.A.M.S.

152

The rapist was in the Ogborn apartment approximately 30 minutes. Immediately after his departure the police were notified and they inspected the apartment and the general area. Mrs. Ogborn was taken to a hospital where she was examined by a physician.

The building located at 415 Sheridan contains a row of ten apartments, Apartment A being located at the north end of the building and Apartment J at the south end. The adjacent apartment building, 421 Sheridan Drive, also has ten apartments, similarly designated A through J, with Apartment A being located at the north end of that building. The two buildings are separated by a drive. 415 Sheridan is north of 421 Sheridan.

The rapist gained forcible entry to the Ogborn apartment through a door leading to the patio on the west side of the building. All of the apartments in each of the two buildings had a west patio. The rapist left tracks of mud and pieces of mud in the Ogborn apartment, and especially in the bathroom where the rape was committed. On the night of the rape Apartment J, located at the south end of 421 Sheridan Drive and rented by Kathryn Dickson, was also burglarized. While officers were investigating the area west of the two buildings, Miss Dickson notified them that her apartment had been entered and mud tracks were "all over the place."

The defendant was arrested on December 12, 1980, at his apartment which was located a mile or a mile and a half from that of the victim. Found in his apartment was a pair of Trax brand tennis shoes, basically blue in color, with red and light brown trim, which he admittedly owned.

Identification of the defendant as the rapist was based on several factors, including the following: (1) Defendant's height, weight, beard and moustache closely correspond with the descriptions given by Mrs. Ogborn and Derek; (2) through laboratory analysis of seminal stains on the victim's panties it was determined that the rapist had Type A blood and that he was a "secreter" of that blood type in his bodily fluids. Forty percent of the population have Type A blood and, of those, 85 percent are secreters. Defendant is a secreter with Type A blood; the victim is a non-secreter with Type O blood; (3) a dark blue "sock cap" was discovered in defendant's automobile at the time of his arrest and it was characterized by the victim as being "like the sock cap" which the rapist wore; (4) evidence concerning a shoe print and pieces of mud, to be discussed later.

The defendant testified that he spent the night of the rape with Regina Schiwitz in the latter's apartment located at 124 South Lorimer, Cape Girardeau. He said he arrived there at approximately 10:30 p. m. on Tuesday and remained there until 8 a. m. Wednesday. Miss Schiwitz testified to the same effect.

In rebuttal of the defendant's alibi evidence, state's witness William Wilson, a police lieutenant, testified that at 2:30 or 3:00 p. m. on Wednesday, November 26, several hours after the rape had been committed, the defendant came to the Cape Girardeau police station and wanted to sign a complaint against defendant's brother Paul Dees. According to Wilson, "[defendant] said that his brother had got so wild that morning about 2:15 that he had to leave his apartment."

State's witness Robert LeFebvre testified that at 3:00 p. m. on the same Wednesday the defendant came to his office at 1032 Broadway, Cape Girardeau. Defendant told the witness that he was concerned because his brother was behaving irrationally and that he, the brother, needed to be returned to the hospital. Defendant stated that his brother threatened defendant with his life when he attempted to get the brother to leave his apartment earlier that day "in the early morning hours." During this conversation LeFebvre observed that the defendant was wearing blue "tennis shoes" or what appeared to be "a running type of shoe." He identified state's Exhibit 14, the shoes found in defendant's apartment, as being similar to those he was wearing. The witness said the shoes looked "battered or weathered, wet, somewhat dirty."

The testimony of Wilson and LeFebvre was to the effect that defendant told them that during the early morning hours of Wednesday, November 26, he, the defendant, was at his apartment which was located at 216 Williams, Cape Girardeau, and that he engaged in an argument with his brother Paul Dees. This directly contradicted the trial testimony of defendant and Regina Schiwitz as to defendant's whereabouts at the time of the rape. Paul Dees is substantially larger than the defendant and the description of the rapist does not fit Paul Dees.

Police investigators, examining the vicinity of the rape within hours after it happened, obtained mud samples from Kay Ogborn's apartment, including pieces of mud from the bathroom. A fresh piece of mud was found at the edge of the patio of Apartment C of 415 Sheridan, approximately 50 feet from the door through which the rapist gained entry to Kay Ogborn's Apartment G. Impressed in this piece of mud was the word "TRAX." A shoe print was found in the mud near the northwest corner of 421 Sheridan, just west of Apartment A in that building, and approximately 134 feet from the victim's apartment. A plaster cast impression of this shoe print was made and photographs were taken of it.

The photograph of the shoe print, the plaster cast impression, the various pieces of mud, mud samples from Kathryn Dickson's apartment, and defendant's shoes were turned over to Robert Briner, Director of Southeast Missouri Regional Crime Laboratory, for analysis.

Dr. Briner, an expert witness for the state, testified that he examined the various items using a technique called "comparison microscopy," which involves the examination of physical items under a microscope and "looking for details, both of individual and class characteristics." Individual characteristics, said the witness, are those which appear on the item and will distinguish that item from similar items within a class. Class characteristics are general character-

istics which place an item only within a class but do not give it individual identity.

Dr. Briner stated that there were five points of "individual comparison" between the photograph of the shoe print behind Apartment A and the right shoe of the tennis shoes taken from defendant's apartment. With regard to the piece of mud with the word "TRAX," Dr. Briner stated that there were eight points of "individual comparison" when it was placed alongside defendant's right shoe. In Dr. Briner's opinion the shoe print behind Apartment A and the impression in the piece of mud were both made by defendant's right shoe.[2]

The most incriminating evidence from Dr. Briner dealt with Exhibit 7 and Exhibit 22. Exhibit 7 was a "jigsaw" piece of mud found in Miss Ogborn's bathroom shortly after the departure of the rapist. Exhibit 22 is a color photograph of the sole of defendant's right tennis shoe "with the piece of mud [Exhibit 7] laid in there." Both Exhibit 7 and the sole of the right shoe contain green paint. The shoe sole contains "suction cups."

Referring to Exhibit 7 and Exhibit 22, Dr. Briner told the jury, "This is a color photograph, as I indicated to you, of this particular portion of the shoe with the piece of mud in this exhibit laid in there; it, it not only fits, but, if you take it end-side-ways, end-on, and look end-on, and, and do some, again some other microscopy work, which I could not photograph successfully to, to demonstrate very well, but, the, the lines, there are lines around *these particular suction cups* and those lines are reproduced in that *particular piece of mud,* and—Q. Is that on the side of the piece of mud? A. Yes, it's on the side of the piece of mud, and, I think when they look at the mud they'll be able to see those lines." (Emphasis added.)

Dr. Briner then took the piece of mud, Exhibit 7, out of a jar and placed it on the sole of defendant's shoe, as depicted in Exhibit 22. Dr. Briner testified "that that

---

**2.** For cases dealing with evidence of this type, see 31 Am.Jur.2d Expert and Opinion Evidence § 124, p. 666; see also 35 A.L.R.2d 856 (Foot Prints as Evidence).

shoe [defendant's right shoe] produced those, the marks we have demonstrated to the jury." Dr. Briner also testified that the green paint on Exhibit 7 and the green paint on defendant's right shoe "were of the same elemental composition" based on his examination of them by electron microscope. Defendant is a sign painter.

The excellent brief of defendant challenges Dr. Briner's testimony and labels it "at best inconclusive, speculative and misleading." In support of that assertion able counsel for defendant make their own extensive analysis of the plaster cast of the shoe print, and photographs of the mud pieces and the shoe print. For example counsel argue that there is a one-inch discrepancy between defendant's right shoe and the plaster cast of the shoe print. Dr. Briner testified that the plaster cast did not figure significantly in his findings. This court has examined the cast and the shoe and is not convinced that the discrepancy exists.

This court has examined the numerous exhibits and the trial testimony in light of the lengthy and painstaking attack made upon Dr. Briner's testimony by defendant's brief. The factors which defendant's counsel emphasize may have been proper topics for cross-examination (and possible explanation by the witness) or for jury argument, but they do not strip Dr. Briner's testimony of its substantiality.

The foregoing evidence was sufficient for the jury to find that the defendant was the man who raped Kay Ogborn. Defendant's first point has no merit.

■ Defendant's second point is that the trial court erred in denying defendant's motion to suppress state's Exhibit 14, defendant's shoes, and in admitting the exhibit into evidence over defendant's objection, for the reason that the shoes were seized from defendant's apartment in violation of defendant's rights under the Fourth Amendment to the U. S. Constitution and Art. I, Section 15 of the Missouri Constitution for the reason that "the initial search of defendant's apartment was unreasonable in that it was conducted by a police officer who had no right to be in the apartment, without a search warrant and in the absence of any exigent circumstances necessitating such a search." This court's review of the trial court's ruling on the motion to suppress "is limited to a determination of whether the evidence was sufficient to sustain its finding." *State v. Baskerville,* 616 S.W.2d 839, 843[2] (Mo.1981).

■ At approximately 10:00 p. m. on December 12, 1980, Officer William McHughs, of the Cape Girardeau police department, and three other officers, all armed and in plain clothes, went to defendant's apartment. The officers had a warrant for the arrest of defendant. The warrant had been issued in connection with the rape of another victim.[3]

The officers entered the hallway of the apartment house in which defendant's apartment was located and knocked on defendant's door. Defendant opened the door and stepped into the hallway, closing the door behind him. Defendant was placed under arrest. Defendant was barefooted and asked the officers if he could get his boots. One of the officers said defendant "could get his boots." Defendant knocked on the door of his apartment and it was opened by his girl friend, Tammy Creg. Defendant told Officer McHughs that "it was all right to go in and get his boots." McHughs entered the apartment, obtained the boots, and handed them to defendant who was still standing in the hallway near the door which remained open.

It was the testimony of Tammy Creg that while defendant was standing outside the open door defendant said, "You are going to have to find a way home or a ride or you are going to have to walk." Tammy asked defendant if she could use the telephone. Tammy asked Officer McHughs "if they could stay with me, wait with me while my

---

**3.** The fact that the tennis shoes pertained to an offense other than the one for which defendant had been arrested is of no moment. *State v.* *Preston,* 583 S.W.2d 577, 580[3] (Mo.App. 1979).

roommate came to pick me up or until I had a way home." Pursuant to that request Officer McHughs re-entered the apartment. At no time did defendant object to McHughs' re-entry.

Defendant's apartment door opened into the living room and it was in that room that Officer McHughs stayed with Tammy Creg for approximately 15 minutes until her roommate arrived. Officer McHughs did not enter any other room nor did he seize anything. While standing in the living room Officer McHughs observed in plain sight a tennis shoe on the floor of the bedroom and noticed that the tread pattern on the sole of that shoe resembled the shoe print found near the apartment of Kay Ogborn. After McHughs had re-entered the apartment defendant was handcuffed and taken to the police station.

█ The foregoing record would justify a finding that the second entry of Officer McHughs into defendant's living room was made with the implied permission of defendant. Defendant had informed Tammy Creg that she was going to have to find a way home and Tammy, in defendant's presence, asked Officer McHughs to remain until her roommate came to pick her up. When McHughs re-entered the living room to comply with the girl's request, defendant made no objection. Defendant had requested Tammy Creg to make arrangements for getting a ride home and the second entry of McHughs at the request of Miss Creg was a part of those arrangements.[4]

The police officer was not a trespasser in the living room and while he was there, with defendant's acquiescence and implied permission, he observed the tennis shoes in plain view and recognized that they were

evidence material to the investigation of the Kay Ogborn case. It was an inadvertent discovery.

Although McHughs testified at the suppression hearing that he did not have defendant's permission to go back into the apartment, the trial court was justified in finding that his testimony, read in context, referred to the lack of express, as distinguished from implied, permission to re-enter.

An officer is lawfully present on the premises of defendant when he is there with the consent of defendant. Underhill, Criminal Evidence, Fifth Edition, Vol. II, § 417, note 54. See also *United States v. Griffin*, 530 F.2d 739, 743 (7th Cir. 1976); *United States v. Leal*, 460 F.2d 385, 389 (9th Cir. 1972); *Alberti v. State*, 495 S.W.2d 236, 237[1–3] (Tex.Cr.App.1973).

The shoes were not found as a result of a search. "They were on the floor, not hidden or concealed in any way. They were in plain view of the officers and were observed by them as they rightfully entered the room.... The mere observation of what is in plain view does not constitute a search." *State v. Collett*, 542 S.W.2d 783, 786[5] (Mo. banc 1976). See also *State v. Williams*, 554 S.W.2d 524, 531[9] (Mo.App. 1977). In *Collett* the officers were lawfully present in the room because they were there for the purpose of executing the arrest warrant for defendant. In the instant case Officer McHughs was lawfully present in the room because he was there with defendant's implied consent.

It is unnecessary to determine whether McHughs would have been justified, under the plain view doctrine,[5] in seizing the shoes

---

**4.** Defendant's subsequent conduct, at the police station, in executing a written consent to search the apartment is consistent with his prior, though not expressly stated, state of mind that McHughs had his permission to re-enter the living room at the request of Miss Creg.

**5.** In *Washington v. Chrisman*, —— U.S. ——, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), the Court held that a police officer, consistent with the Fourth Amendment, may accompany an arrest-

ed person into his residence and seize contraband discovered there in plain view. In the majority opinion said: "The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). Here, the officer had placed Overdahl

when he first saw them. He did not do so. After seeing the shoes Officer McHughs telephoned his supervisor and suggested that a search warrant be procured.

Officer McHughs then returned to the police station where he talked with defendant and gave him the *Miranda* warnings. Defendant, who is a college graduate with a "BS in art and a minor in business," signed an acknowledgment that he had received the *Miranda* warnings which were contained in the acknowledgment. The document recited, "I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions and I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

Thereafter McHughs informed defendant that he had the right to refuse to consent to the search of his apartment. McHughs asked defendant if he had any objection and defendant told McHughs "that he had nothing to hide, that we could look." Defendant signed a written "consent to search and seize," the premises covered by the consent being defendant's apartment and his automobile. That document recited that defendant had been informed of his right to refuse to consent to the search and that his permission "to search and seize" was given voluntarily and "without threats or promises of any kind being made to me." After obtaining the consent to search, McHughs and other officers named in the written consent returned to the apartment where several items, including the tennis shoes, were seized. Defendant accompanied McHughs to the apartment, was present during the search, and entertained the officers by playing a guitar while the search was conducted. The sock cap was seized after a search of defendant's car.

under lawful arrest, and therefore was authorized to accompany him to his room for the purpose of obtaining identification. The officer had a right to remain literally at Overdahl's elbow at all times; nothing in the Fourth Amendment is to the contrary."

In a dissenting opinion Mr. Justice White said, at p. 819: "*Coolidge* emphasized that the plain view doctrine applies only after a lawful search is in progress or the officer was otherwise legally present at the place of the seizure. The initial intrusion must be justified by a warrant, by an exception to the warrant requirement, or by other circumstances authorizing his presence.

"If a police officer passing by an open door of a home sees incriminating evidence within the house, his observation may provide probable cause for the issuance of a search warrant. Yet the officer may not enter the home without a warrant unless an exception to the warrant requirement applies."

On p. 820 Mr. Justice White quoted the following language from *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968): "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence."

Mr. Justice White said: "The broad wording [of the quotation from *Harris*] has apparently created some confusion regarding the plain view doctrine. One commentor remarked:

" 'The hardest conceptual problem attending the plain view doctrine is to grasp that it is not a universal statement of the right of a police-man to seize after seeing something in open view; it is rather a limited statement of that right in one of its several instances—following a valid intrusion. . . . The source of difficulty is that the harbinger case, *Harris v. United States,* spoke carelessly in universal terms: "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure. . . .

" 'Seeing something in open view does not, of course, dispose . . . of the problem of crossing [a] constitutionally protected threshold.' Moylan, 'The Plain View Doctrine, Unexpected Child of the Great "Search Incident" Geography Battle,' 26 Mercer L.Rev. 1047, 1096 (1975). See also 1 W. LaFave, Search and Seizure § 22(a) (1978)."

See also *People v. Pakula*, 89 Ill.App.3d 789, 44 Ill.Dec. 919, 924, 411 N.E.2d 1385, 1390 (1980), where the court said:

"The doctrine of plain view is not an exception itself to the requirement that a search or seizure must be supported by a warrant issued by a judge upon a finding of probable cause. Plain view serves only to provide a means of satisfying the requirement of probable cause. Without the simultaneous existence of one of the true exceptions to the warrant requirement, plain view cannot substitute probable cause, rightly thought to exist by a police officer for the impartial decision of a neutral and detached magistrate capable of fairly determining whether probable cause truly exists."

"In general, an entry and search without a warrant are deemed unreasonable under the Fourth Amendment to the Constitution of the United States unless the action falls within certain carefully delineated exceptions.... The burden is on the state to show an exception exists.... Among the exceptions are ... searches with consent." *State v. Epperson,* 571 S.W.2d 260, 263[1–3] (Mo. banc 1978).

■ The fact that defendant was under arrest at the time he gave his consent to search is not "enough in itself" to establish that such consent was involuntary. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). The additional factors of incarceration and handcuffing do not necessarily make the consent involuntary. *United States v. Cepulonis,* 530 F.2d 238, 244 (1st Cir. 1976). See generally 9 A.L.R.3d 858 (Validity of consent to search given by one in custody of officers).

Here there was no evidence that the consent to search was extracted by coercion. The contents of the document signed by defendant and his subsequent conduct in connection with the search itself, together with the other facts previously recited, justified a finding by the trial court that the consent to search was voluntarily given. Defendant's second point has no merit.

■ Defendant contends in his third point that the trial court erred in granting on the morning of trial the state's motion to endorse Kathryn Dickson as an additional witness. Her testimony is discussed under defendant's next point. More than five months before trial, defendant's counsel were provided with a report of the burglary at her apartment and were given an opportunity to talk to her the day of the trial. The trial court has broad discretion to permit late endorsements, and we do not reverse a conviction unless that endorsement created prejudice to the defendant. *State v. Cameron,* 604 S.W.2d 653, 658[13] (Mo. App.1980). Counsel for defendant had sought to suppress evidence of the burglary at her apartment and could have reasonably anticipated that she might be called to testify by the state. See *State v. Strawther,*

476 S.W.2d 576, 580[3–4] (Mo.1972). Defendant has not shown how he was prejudiced due to the late endorsement; therefore, this point is denied.

Defendant's fourth point is that the trial court erred in receiving into evidence, over defendant's objection, testimony from Kathryn Dickson and physical evidence regarding a burglary of her apartment on the morning of November 26, 1980, for the reason that defendant was not on trial for the Dickson burglary and evidence of that crime had no relevance or materiality to the offenses for which defendant was being tried, the rape of Kay Ogborn and the burglary of her apartment. The Dickson apartment was located at the south end of 421 Sheridan. The Ogborn apartment was located in the middle of the adjacent building, 415 Sheridan. The two apartments were separated by twelve other apartments and a driveway.

Over defendant's objection Kathryn Dickson was permitted to testify that her apartment was burglarized on the same night that Kay Ogborn was raped. Forcible entry had been gained to her apartment through a bathroom window. Miss Dickson's fiancé was present at the apartment when the burglary occurred. Neither he nor Miss Dickson saw the burglar. The next morning Miss Dickson found that $20 was missing from her purse. She testified that there were mud prints "all over the place." Mud chips collected from the Dickson apartment were, over defendant's objection, admitted into evidence. The evidence showed that they could have come from the same shoe that left the mud in the Ogborn apartment.

■ "The general rule is that on a prosecution for the commission of a crime, evidence of other offenses is not admissible." *State v. Hancock,* 451 S.W.2d 6, 8[1] (Mo. 1970). Such evidence, however, is admissible if it has some legitimate tendency to establish directly the accused's guilt of the crime with which he is charged. *State v. Hicks,* 591 S.W.2d 184, 192[6] (Mo.App. 1979). Evidence of other crimes is admissi-

ble to prove the specific crime charged when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other, or identity of the person charged with the crime on trial. *State v. Wing,* 455 S.W.2d 457, 464[10] (Mo.1970), cert. denied 400 U.S. 1009, 91 S.Ct. 566, 27 L.Ed.2d 621 (1971).

 The state argues that evidence of the Dickson burglary was admissible to prove defendant's identity. We agree. There was no question that the crime of burglary and rape occurred here; the only question was whether defendant was the perpetrator. It is a reasonable inference under the circumstances that the same person broke into both the Dickson and Ogborn apartments. The time, the manner of entry, the mud and the theft of money were all similar. Two forced entries in such close proximity, both involving essentially the same manner of gaining entry and the fact that each apartment had similar muddy shoeprints would indicate that it is at least probable that the same person committed both. See *State v. Williams,* 602 S.W.2d 209, 212[4] (Mo.App.1980).

However, whether or not it was established that the same person broke into both apartments, this was certainly a possibility, and as such, was a fact for the jury to consider. Without it, they would not be fully advised of the circumstances occurring in the immediate vicinity of the rape that night. When a fact is to be established by circumstantial evidence, all surrounding circumstances are properly considered by the jury if they have any bearing on the ultimate fact sought to be established. *State v. Stout,* 198 S.W.2d 364, 367[3] (Mo.App. 1946). See also *State v. Cox,* 527 S.W.2d 448, 454 (Mo.App.1975); 2 Wigmore, *Evidence,* § 411, p. 479 (Chadbourn rev. 1979).

*"In cases wholly or largely depending on circumstantial evidence,* the trial court has a broad discretion in the admission of evidence, and greater latitude is allowed in the admission of evidence than otherwise. In such cases every circumstance affording the basis of a logical inference relative to the issue, or reasonably tending to shed any light on the issue, is admissible". 22A C.J.S. Criminal Law § 604, pp. 411–412 (1961). See also *State v. Atkinson,* 293 S.W.2d 941, 943[3] (Mo.1956). When evidence is circumstantial, the state is permitted to show facts which, when standing alone, may be without probative force, but when connected by evidence with other facts are admissible as material, even when they tend only remotely to establish the ultimate fact. 22A C.J.S. Criminal Law § 637, p. 499 (1961).

Dr. Briner said that both the full imprint and the trax imprint were made by the defendant's tennis shoe. Defendant seriously questions his testimony. The break-in at the Dickson apartment is relevant as tending to show that the "full" shoe imprint was made by the same person who broke into the Ogborn apartment, leaving mud chips, and four apartments down left the "trax" imprint. Starting from the south going north, one first passed the Dickson apartment, then the place where the full imprint appeared. One hundred thirty-four feet further north was the Ogborn apartment. Approximately fifty feet north of it the trax imprint was found. If the Dickson break-in and the rape were committed by the same person, that break-in shows that he was on the south side of defendant's apartment where the full imprint of the foot was found.

As authority on this point defendant primarily relies on *State v. Mathis,* 375 S.W.2d 196 (Mo.1964) and *State v. Strickland,* 530 S.W.2d 736 (Mo.App.1975). Neither are controlling here. In *Mathis* evidence of another burglary was not considered relevant because it did not show that defendant committed the crime charged. Here the overall picture and the path of the perpetrator could be important to the jury in determining if the mud samples found in the Ogborn apartment and the imprints found outside the apartments all came from the same shoe. In *Strickland* the evidence of another crime was "not connected" with the defendant. See 530 S.W.2d at 737. Here we

believe that the break-in was sufficiently connected to other relevant evidence for the jury to be advised of it.

If the jury believed that the Dickson break-in and the burglary and rape at the Ogborn apartment were committed by the same person, that would not by itself tend to make them believe that defendant was that person. We believe that showing the known details of the Dickson burglary would not create any improper prejudice to defendant and that the value of the jury being fully advised of the facts would outweigh any prejudice that might arise from the fact that the perpetrator of the crimes defendant was charged with may have broken into another apartment on the night of those crimes.

We hold that evidence of the burglary at the Dickson apartment was admissible to provide the jury with all the circumstances surrounding the crimes charged and specifically as to the circumstances which might be relevant to their consideration of the origin of the mud samples and shoe imprints in evidence. Point four is denied.

■ Defendant's fifth point is that he was denied a fair trial because he did not have effective assistance of counsel. He points to several things that he says counsel should have done. Whether those would have been helpful, or whether counsel declined to do so as trial strategy, we cannot say on the record before us. Our review of the entire record convinces us that defendant's trial counsel vigorously and competently defended him. This point is denied.

■ Defendant's sixth point is that the trial court erred in denying his request to strike for cause a venireman who was a drivers' license examiner employed by the Missouri Highway Patrol. It is within the sound discretion of the trial judge to determine when a challenge for cause should be sustained, and his decision should not be reversed unless there is a clear abuse of discretion. *State v. Stewart,* 596 S.W.2d 758, 760[8] (Mo.App.1980). Friendship or relationship with a police officer is not alone sufficient to disqualify a venireman.

*State v. Dodson,* 551 S.W.2d 932, 934[4] (Mo.App.1977), cert. denied 434 U.S. 1071, 98 S.Ct. 1255, 55 L.Ed.2d 774 (1978). The venireman indicated that he could fairly hear the evidence and we find no abuse of discretion here. This point is denied.

■ Defendant's seventh point is that the trial court erred in failing to give MAI–CR2d 2.70. A similar point was denied in *State v. Bellah,* 603 S.W.2d 707, 710–711[6] (Mo.App.1980), and our discussion of it is applicable here. Point seven is denied.

■ In defendant's eighth and ninth points he contends that the trial court erred in failing to declare a mistrial because of portions of the prosecuting attorney's closing argument. The drastic nature of a mistrial requires that it be granted only in extraordinary circumstances where the prejudicial effect cannot be removed in any other way, and such a determination rests largely within the discretion of the trial judge. *State v. Reynolds,* 608 S.W.2d 422, 427[5–6] (Mo.1980). We find no abuse of discretion in not granting a mistrial in either of the respects claimed here. Points eight and nine are denied.

■ Defendant's tenth and final point is that the trial court erred in denying his motion requesting a reduction of the jury's assessment of 35 years imprisonment on the rape conviction. Defendant argues that this punishment is too severe for the crime, and necessarily has to result from bias, passion and prejudice. Under the circumstances shown here, we are not convinced that this term of imprisonment was based on bias, passion or prejudice. This point is denied.

The judgment is affirmed.

BILLINGS, P. J., and TITUS and PREWITT, JJ., concur.

MAUS, C. J., concurs and files concurring opinion.

FLANIGAN, J., dissents and files dissenting opinion.

MAUS, Chief Judge, concurring.

I concur. However, I have a slightly different analysis than that expressed in the majority opinion concerning why the Dickson evidence was admissible. For that reason I file this concurring opinion. Ms. Dickson was a single woman living in the apartment complex with her young son. However, at the time of the incident in question, her fiance spent the night with her. When they arose the next morning, they discovered her apartment had been entered through the bathroom window. There were muddy footprints in the bedroom, kitchen, and, as she put it, "all over the place". These footprints included tracks on the stairs and into her upstairs bedroom. Her clothing, which had been on the floor by her bed, was found downstairs by the patio doors. $20 was missing from her purse which she had left downstairs. The state's evidence was to the effect that chips of mud, or footprints, in the Dickson apartment could have been made by the defendant's shoes, although they did not have sufficient individual characteristics to permit positive identification as having been made by those shoes. As noted in the majority opinion, there was a footprint between the apartment building in which Ms. Dickson lived and the apartment building in which Ms. Ogborn lived that was positively identified as having been made by the defendant.

The rule in Missouri concerning the admission of evidence that involves another offense committed by a defendant is most frequently said to be the exclusionary rule set forth in *State v. Hancock,* supra; *State v. Wing,* supra, cited in the majority opinion. The affirmative statement of the rule is that such evidence is admissible if it tends "logically, naturally, and by reasonable inference to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense". *People v. Peete,* 28 Cal.2d 306, 169 P.2d 924, 929 (1946). Compare *State v. Tallie,* 380 S.W.2d 425 (Mo.1964); *State v. Fisher,* 302 S.W.2d 902 (Mo.1957); *State v. Iaukea,* 537 P.2d 724 (Haw.1975). The two rules are discussed in *Iaukea* in which the court ob-

served that the use of the exceptions under the exclusionary rule is to determine the relevance of the evidence in question. That court observed that some courts have applied the exceptions "to come almost full circle back to the affirmative statement of the rule". *Iaukea,* supra, at 730. I do not believe it was error to admit the evidence in question under either statement of the rule.

To be relevant it is not necessary that evidence be conclusive upon a given issue. There is a distinction between evidence being admissible and evidence being sufficient to support a verdict. Evidence is "relevant if it logically tends to prove a fact in issue or corroborates relevant evidence which bears on the principal issue". *State v. Mercer,* 618 S.W.2d 1, 9 (Mo. banc 1981). If there is doubt concerning relevance, that doubt is to be resolved in favor of admissibility. *State v. Williams,* 566 S.W.2d 841 (Mo.App.1978). A determination of relevance made by a trial court will be disturbed only if an abuse of discretion is shown. *State v. Wood,* 596 S.W.2d 394 (Mo. banc 1980).

The principal issue in this case is the identification of the man who attacked Ms. Ogborn and took $10 from her purse. The defendant emphasized this issue by his alibi of having spent the entire evening and night with his girl friend. Any evidence, even though that evidence may be connected with another offense, which places the defendant in the immediate vicinity of the Ogborn apartment the night in question is relevant. It is relevant to overcome the tendered issue of alibi. It also "tends to establish ... the identity of the person charged with the commission of the crime on trial". *State v. Wing,* supra, 455 S.W.2d at 464.

The defendant contends that he is not sufficiently identified with the footprint at the Dickson apartment for the evidence in question to be admissible. This is not the case. There was evidence to establish that this footprint could have been made by the shoe of the defendant. This makes evidence of that footprint admissible to estab-

lish the presence of the defendant in the vicinity of the Ogborn apartment. This is true even though that evidence is not conclusive of his presence and would not alone support a verdict of guilty. Positive identification of that footprint was not required to make such evidence admissible. *State v. Kelly,* 111 Ariz. 181, 526 P.2d 720 (banc 1974); *People v. Robbins,* 21 Ill.App.3d 317, 315 N.E.2d 198 (1974). The fact the two entries were related by the closeness of time and distance and the intervening footprint more clearly makes the Dickson footprint relevant on the issue of identity.

Given the proximity in time and place and the similarities of the crimes the evidence of the City robbery was admissible as evidence that the defendant and his companions had embarked upon a common scheme to rob school children at both sites and that the robberies in the County were committed by the same people identified in the City. *State v. Adail,* 555 S.W.2d 672, 675 (Mo.App.1977). Compare *State v. Peterson,* 543 S.W.2d 566 (Mo.App.1976); *State v. Granberry,* 530 S.W.2d 714 (Mo.App.1975).

The fact there were other footprints in the area positively identified as having been made by the shoe of the defendant does not render the footprint in the Dickson apartment inadmissible. The admission of relevant evidence is not error because it is cumulative or corroborative of other evidence. "However, other evidence will not prohibit use of demonstrative evidence which has probative value in establishing conditions and corroboration of witnesses on the issues of the case." *State v. Mucie,* 448 S.W.2d 879, 887 (Mo.1970).

The admissibility of the footprint in the Dickson apartment may be demonstrated by comparing the evidence of the footprints to visual identification. The footprint that could have been made by the defendant's shoe is the equivalent of a general physical description. The footprint identified by individual characteristics as having been made by the defendant's shoe is the equivalent of a definite identification. The testimony of a witness that on the night in question he saw a man whose general description fit the defendant enter the Dickson apartment would not be made inadmissible by the testimony of another witness that he saw the defendant at a point between the two apartment houses.

In addition to contending that he was not sufficiently connected to the footprint in the Dickson apartment, the defendant contends the evidence in question should have been excluded because the prejudicial effect thereof outweighed its probative value. This argument will be considered even though the scope of the limitation of prejudice upon the admission of relevant evidence is not clearly defined. Compare *State v. Holt,* 592 S.W.2d 759 (Mo. banc 1980); *State v. Williams,* 602 S.W.2d 209 (Mo.App.1980). To support this contention he cites the argument made by the state which is quoted in the dissenting opinion. In view of the rule concerning a pattern of action in sex offenses hereafter cited, it is probable that argument was proper. In any event, the defendant is not entitled to rely upon that argument to establish prejudice. The defendant did not object to that argument. Further, that argument was invited by the defendant. The defendant in his closing argument asserted the improbability that he would take $10 at 3:00 a. m. when he had over $2,000 in the bank. The state legitimately responded to that argument.

The defendant further argues he was prejudiced because he was not sufficiently identified with the Dickson offense. This argument has been answered in demonstrating that such evidence was relevant. However, even assuming that it was not, that would be no reason for reversal. "If the latter contention is correct, the testimony probably was not relevant, but a judgment is not to be reversed because of the admission of irrelevant and immaterial evidence which is not prejudicial to the defendant." *State v. Parker,* 476 S.W.2d 513, 515 (Mo.1972).

The defendant then argues evidence of the Dickson entry did prejudice him by tending to cause the jury to believe that he

committed both offenses. In speaking of the Dickson footprint, that footprint did prejudice the defendant by tending to establish his identity as being in the vicinity. But, that is not the type of prejudice that is to be considered as militating against admittance of relevant evidence. That is the very purpose in admitting the evidence even though it involves another offense.

The defendant's real argument seems to be that, aside from the footprints, the details of the offense at the Dickson apartment are so similar to the details of the offense at the Ogborn apartment as to cause the jury to believe he committed both offenses. This argument does not establish the trial court erred. First, the defendant objected to all evidence relative to the Dickson apartment. He did not specify any portion thereof. The trial court was not required to sift through that evidence to determine the inadmissible portions thereof.

Second, the two offenses are remarkably similar. In each offense the apartment of a young single woman was entered; in each the offender made his way to the upstairs bedroom; in each the only thing taken was a small amount of money; and in each the offender wore the same type of tennis shoes which could make the same footprint. It could be found that the Dickson offense involved sexual overtones as that offender for some unexplained reason carried the young woman's clothes downstairs. The defendant's argument in this respect is self-defeating. A pattern in the commission of offenses, or a modus operandi, may cause evidence of the commission of one offense to be admissible as proof of the identity of the offender in another offense. Wharton's Criminal Evidence § 243. This is particularly true of offenses involving sexual activity. Annot., Evidence—Similar Sexual Offenses, 77 A.L.R.2d 841 (1961); *State v. Williams,* supra; *Lingerfelt v. State,* 147 Ga.App. 371, 249 S.E.2d 100 (1978). For the reasons stated, I believe the admission of the evidence concerning the Dickson apartment was not an abuse of discretion by the trial court.

FLANIGAN, Judge, dissenting.

I respectfully dissent.

The principal opinion considers ten points raised by the defendant and holds that all ten are invalid. I concur fully in nine of those rulings. My dissent is confined to the ruling on defendant's fourth point. In my opinion that point is a valid one and the trial court committed reversible error in admitting, over defendant's objection, evidence concerning the burglary of Kathryn Dickson's apartment on November 26, 1980.

The state argues that the evidence was admissible as tending to identify defendant as the rapist of Kay Ogborn. The principal opinion agrees with the state. I disagree.

"When admitting evidence of other crimes, it is important that the trial court consider not only the rule of exclusion but also the matter of discretion. Some courts proceed on the assumption that the decision of admitting or not admitting such evidence turns solely upon the ascertainment and application of the rule, in other words, whether or not the evidence comes within a certain category which constitutes an exception to the rule of exclusion. This should not, however, be a matter of pigeonholing, but one of balancing, on the one hand the actual need for such evidence, and on the other the degree to which a jury may be prejudiced against the defendant by hearing such evidence. The matter should be one of careful discretion on the part of the trial court. This is especially true when the ultimate purpose of the State is to prove the identity of an accused." *State v. Burr,* 542 S.W.2d 527, 531[4] (Mo.App.1976). See also *State v. Cheesebrew,* 575 S.W.2d 218, 223[9] (Mo.App.1978); *State v. Hamell,* 561 S.W.2d 357, 360 (Mo.App.1977).

The state's expert witness, Dr. Briner, testified that in his opinion *defendant's* right shoe produced the marks on the piece of mud found in Miss Ogborn's bathroom. Dr. Briner also testified that *defendant's* shoe produced the shoe print behind Apartment A near the northwest corner of 421 Sheridan and the print in the piece of mud found at the edge of the patio of Apart-

ment C of 415 Sheridan.[1] Dr. Briner's opinion was that "no other shoe of the same size and same brand could have caused those shoe prints." Significantly Dr. Briner was unable to provide specific identification with respect to the mud chips collected from the Dickson apartment.

As the principal opinion points out, Dr. Briner's testimony would justify the inference merely that the mud chips "could have" come from the same shoe which left mud in the Ogborn apartment. In other words, the physical evidence in the Dickson apartment contained only "class characteristics,"[2] while the evidence inside the Ogborn bathroom and the two outdoor prints had "individual characteristics."

The state's evidence showed that a specific shoe, that of the defendant, produced the markings in Miss Ogborn's bathroom and the two outdoor prints. That was strong evidence indeed on the issue of the identity of the rapist. On the contrary, the physical evidence collected from the Dickson apartment possessed only class characteristics which added nothing on the issue of identity. The state does not claim that the evidence was sufficient to show that defendant committed the burglary of the Dickson apartment. Evidence of the Dickson burglary contributed nothing to the state's burden of proof.

In *State v. Strickland*, 530 S.W.2d 736 (Mo.App.1975), the residence of one Lee was located "next door" to the townhouse apartment of Murray. Defendant was charged with burglary of the Murray apartment on November 14, 1973. The state introduced evidence of pry marks found that day on the door of the Lee residence. Defendant was found in a nearby alley. Near him was found a tire iron which fitted snugly into the marks on Lee's door. Defendant was not linked by fingerprints to the tire tool nor was it ever seen in his possession. The court of appeals held that the trial court erred in receiving evidence of the attempted burglary of Lee's apartment because defendant was not connected with the incident at Lee's door.

In *State v. Mathis*, 375 S.W.2d 196 (Mo. 1964), defendant was charged with the burglary of a store room located at 1210 Truman Road in Kansas City on August 29, 1962. The state, over defendant's objection, introduced evidence that after midnight on that date a policeman found defendant sitting in a car parked at 1401 Truman Road. The state's evidence showed that the building at 1401 Truman Road had been broken into, that it had recently been painted, and that at the time of his arrest defendant had paint on his hands similar to that on the building. The court rejected the state's argument that the break-in of the building at 1401 Truman Road was part of the "res gestae." It pointed out that commission of the burglary at 1201 Truman Road "was necessarily a completed transaction separate and apart from the commission of a second burglary or unlawful breaking two blocks distant." At p. 199[4] the court said:

"The state contends that the evidence which admittedly tended to show that defendant broke into the office building at 1401 Truman Road was properly admitted over objection because it tended to establish intent, absence of mistake or accident, a common scheme or plan embracing the com-

1. These two prints are respectively referred to as "the full imprint" and "the TRAX imprint" in the principal opinion.

2. This reference to Dr. Briner's testimony is based on the most favorable view of the evidence from the standpoint of the state. State's Exhibit 10 consisted of "three small wedge-shaped pieces of mud" found in the Dickson apartment. Dr. Briner compared Exhibit 10 with defendant's shoe. This testimony ensued:

"PROSECUTOR: Dr. Briner, after making your comparisons and analysis were you able to arrive at an opinion as to the origin of the pieces of mud?

"DR. BRINER: If we refer, want to refer to each one of them separately, No. 10, the wedge-shaped pieces of mud, we were able to match in varying relatively unique class characteristics but not individual characteristics, to areas on the shoe, which the pieces of wedge fit into the shoe, as well as there are some, a couple, in places where there are protrusions on the side of the shoe which would then cause an indention in the piece of mud, and we felt, even though they, that was, was quite unusual, we did not, we were not able to ascribe class characteristics to it because we only had one point of comparison."

mission of two or more crimes so related to each other that proof of one tended to establish the other, or the identity of the defendant. We cannot agree. The crimes were not related, and the fact that defendant may have broken into a building at 1401 Truman Road could not tend to show his intent to commit an unrelated burglary at some previous time two blocks away at 1210 Truman Road. Neither could it tend to show absence of mistake or accident in breaking into the building at 1210 Truman Road, or the identity of the one who did so."

Under the foregoing authorities, evidence of the Dickson burglary was inadmissible. That the error was prejudicial is demonstrated by the fact that the prosecutor, in his final argument to the jury, said: "I'll call your attention to the apartment down the street, he got 20 bucks out of there too, but, when he dragged those muddy footprints up those stairs and saw that some young lady in Apartment J had a big man with her, then he went down a half a block away and got into Kay Ogborn's apartment and she did not have a man there. His intention was to rape."

In my opinion defendant's fourth point is meritorious and the judgment should be reversed and the cause remanded for new trial.