STATE of Missouri, Respondent,

v.

Ricky L. BASKERVILLE, Appellant.

No. 61661.

Supreme Court of Missouri,
Division No. 2.

June 8, 1981.

Lee M. Nation, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, for respondent.

STOCKARD, Commissioner.

Ricky L. Baskerville was charged by information in lieu of indictment in three counts with the capital murders by shooting of Vicki Kanion, James Harris, and Ernest Booker. He was found guilty by a jury of the murder charged in each count and the jury imposed a sentence of life imprisonment as to Count I (Vicki Kanion) and Count II (James Harris), but were unable to agree on the punishment as to Count III (Ernest Booker), and the punishment as to that count was fixed by the court at life imprisonment.

On this appeal appellant does not challenge the sufficiency of the evidence as to any of the counts. It is sufficient to state that the jury reasonably could find from the evidence that at 4522 Cypress Street in Kansas City, Missouri, on November 18, 1978 appellant killed James Harris by shooting him, and that he also shot and killed Vicki Kanion, the sister of James Harris. He then shot and killed Ernest Booker, the small child of Vicki Kanion who apparently was attempting to hide under a table.

By his first point appellant asserts the trial court erred in admitting into evidence "statements obtained" from him "during the November 20, 1978 and November 21, 1978 police interrogations" because (a) "*Miranda* warnings were not given * * * until after potentially incriminating statements were obtained, despite the fact that the interrogation was custodial in nature," and (b) statements made after the *Miranda* warnings were given which pertained to and resulted from evidence which earlier was wrongfully obtained.

The police conducted an investigation of the murders, and in doing so searched the area for physical evidence. They also talked to neighbors but did not locate any potential witnesses. On November 20 Officer Singleton was contacted by Michael Watson who stated that he had heard the police wanted to talk to him, and he arranged to meet Officer Singleton. Watson then related to Officer Singleton that he had "a good idea who had killed the people in [the Harris] house," and he stated that he believed the killer was "a Negro male six foot two, thin build, dark complexion, who wore a full-length black leather jacket with the first name of Ricky, [and] who was an amateur boxer." He also stated that on November 15, which was three days before the homicides, "two Negro males, one being [the person referred to as Ricky] and the other * * * described as a light complected Negro male, were at the victim's house at the time he [Watson] was at the house." At that time Officer Singleton knew the victims had been shot with a .22 caliber weapon, and Watson said that the party with the person he knew as Ricky had a .22 caliber automatic with him, but that the party stated he was carrying the pistol for Ricky. When Officer Singleton and Watson arrived at the police station some photographs were shown to Watson, and he identified a photograph of appellant as the person he knew as Ricky. Officer Singleton had previously spoken to appellant concerning an unrelated case, and at that time appellant was wearing a long black leather jacket and indicated that he was involved in the Golden Gloves boxing program.

Officer Williams interviewed three persons, and from one of them, Michele Jackson, he received the information that her brother, Todd Jackson, had told her that appellant had been at his home on the evening of November 18, 1978, and had stated that he had committed the homicides. Elfonso Brown verified what Michele Jackson had told the officer.

Officer Patrick Stark was assigned to investigate the murders. On November 19 he searched the area for physical evidence and talked to several people in the area. On the morning of November 20 appellant was at Police Headquarters "for questioning on another offense" and to take a polygraph test. The record does not disclose whether or not he had voluntarily gone to the station.

After a briefing on the morning of November 20, Officer Stark was assigned to interview appellant. He started to question appellant at 11:30 o'clock, and at that time the only information Officer Stark had of

appellant's possible involvement in the homicides was that appellant "may [have known] James Harris or had been * * * to Harris' house." He was not then aware of the information that had been obtained by Officer Singleton and Williams.

Appellant filed a motion to suppress any statement made by him to Officer Stark at this interrogation because he (a) "was not advised of his right to remain silent and his right to presence of counsel until after several hours of interrogation by Detective Stark, and after statements had been made [by him] regarding this cause," and (b) the interrogation occurred "after investigative officers * * * had collectively received sufficient information to establish probable cause" for appellant's arrest. The trial court conducted a pre-trial hearing on this motion.

Appellant does not set forth in his point or in the argument portion of his brief what "potentially incriminating statements" were obtained from him prior to the giving of Miranda warnings, and particularly important in the circumstances of this case is the fact that appellant did not contend in his motion to suppress and he does not contend on this appeal that any statement was involuntarily made by him, or that he wanted but was denied the right to have counsel present. In fact, after some interrogation by Officer Stark, the information previously related was received from Officer Singleton and Officer Williams, and it was that information which caused Officer Stark to place appellant under arrest and advise him of his Miranda rights. Immediately thereafter appellant signed a written waiver of those rights and the interrogation then continued.

Notwithstanding the deficiency of the point and its presentation, because of the seriousness of the offenses charged and in a liberal exercise of judicial discretion, we have read and carefully studied the evidence presented at the pretrial hearing in support of the motion to suppress.

It is extremely difficult to determine from the testimony at the pretrial hearing what statements were made by appellant to Officer Stark before the Miranda warnings were given. Questions were asked of the officer concerning his investigation and what he had learned. He stated that he talked with appellant on the second floor of the Police Headquarters, and that he "questioned him as to his knowledge [of] or association with any of the victims," and according to Officer Stark, appellant "volunteered that information * * * that he had been present on * * * the day that the victims were found." He then questioned appellant "regarding his presence at or near the scene," and he asked "[w]hat atmosphere was at the house, who else was present, and general questions as to * * * Mr. Harris' associates." He did not relate appellant's answers. In the course of the interrogation appellant stated that he had gone home after leaving the Harris residence on November 20 at approximately 3:30 o'clock. It appears that later, but we cannot tell if it was before or after the Miranda warnings, appellant stated that he had not gone straight home but had gone to Todd Jackson's house. It was during this time that Officer Stark was advised by Officer Singleton that appellant "had been to Mr. Harris' residence two days, or the Wednesday prior to the homicide," and he also received information that appellant "or someone with him had a .22 caliber gun in their possession on the 15th." Officer Stark then asked appellant "if he had been at the house on the previous Wednesday * * * prior to the homicide" and he indicated that he had. Officer Stark testified that the first "incriminating information" concerning appellant he had received was from Officer Williams that appellant had admitted to Todd Jackson he had committed the homicides. It was at this time that he informed appellant he was under arrest, and he did not question appellant further until he waived in writing his Miranda rights.

The trial court overruled the motion to suppress, and in doing so commented: "I believe in this case there was a general investigation ongoing at the time, albeit, there may have been custody for some other purpose, * * *."

■ From the record before us we cannot determine whether appellant was being held in custody because of the other and unrelated crime, and we do not know whether in the course of the investigation by the police of that crime appellant was given his *Miranda* rights. However, appellant was not "in custody" at the time of the interrogation by Officer Stark prior to receiving the "*Miranda*" warnings on the basis that he was being restrained because of his possible involvement in this case. The interrogation by Officer Stark was of a general investigatory nature. It occurred at the police station instead of at appellant's house or at some other place only because appellant was already at the police station. It is clear that at that time appellant was not a suspect. He was being interrogated because he was acquainted with the victims in an attempt to obtain information. In fact, another person was then being held in custody as a suspect, and the investigation had not then focused on appellant.

■ Our review of the trial court's ruling on the motion to suppress is limited to a determination of whether the evidence was sufficient to sustain its finding. *State v. Collins*, 519 S.W.2d 362 (Mo.App.1975); *State v. Duncan*, 540 S.W.2d 130 (Mo.App. 1976).

■ Police officers "are not required to administer *Miranda* warnings to everyone they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the [police] station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). A practical and common sense consideration of the facts of this case indicates it is a situation in which the *Miranda* warnings were not required until as the result of the general investigation and information received from other sources, it became reasonably apparent that further interrogation could reasonably cause the officers to believe appellant had some involvement in the homicides.

■ Assuming, however, that the interrogation did not comply with the technical requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1968), we find no prejudicial error requiring reversal of the judgment. The *Miranda* decision mandates that a person be appraised of his Fifth and Sixth Amendment rights prior to "custodial interrogation." We shall assume appellant was in custody when he was being interrogated by Officer Stark. While it is well settled that a statement made in violation of *Miranda*, and evidence obtained as a result of that illegality, is inadmissible, it is also firmly established that evidence obtained as a result of impermissible police conduct does not "become sacred and inaccessible." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Thus certain exceptions to the exclusionary rule have been recognized. One such exception is that evidence may be admissible, despite police misconduct, if the causal connection between the illegality and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). A second exception is that the exclusionary rule has no application when knowledge of the illegally obtained evidence is gained from a source independent of the illegality. *Silverthorne Lumber Co. v. United States*, supra. As far as we can tell from the record the only statements made by appellant to Officer Stark before the *Miranda* warnings were given, which could possibly indicate any involvement by him in the homicides, were that (a) he knew one of the victims and was acquainted with the other two; (b) he had been at the scene three days prior to the crimes; and (c) he had been at the scene of the shooting the day of the crimes but claimed to have left about 3:45 o'clock and had gone straight home. All of this information had previously been received from an independent source by Officer Singleton. Thereafter, appellant was given the *Miranda* warnings and he signed a waiver of those rights. There is no contention that this waiver was not voluntarily and understandingly made.

Because of the inadequacy of the pretrial hearing, we turn to the testimony at trial. The objection to the testimony of Officer Stark concerning statements made by appellant was "for the reasons set out in the pretrial motion to suppress," and that when Officer Stark "spoke with" appellant on November 20 "they [apparently the various police officers] had in their possession" the information that appellant had told Todd Jackson that he had committed the homicides. From that testimony of Officer Stark it cannot be determined which statements of appellant were made before and which were made after the *Miranda* warnings. On November 21, the day following the interrogation by Officer Stark, appellant was interrogated by Officer Carroll who first gave him the *Miranda* warnings. Appellant then signed a written waiver of rights and there is no contention that this waiver was not voluntarily and understandingly made, or that the statements by appellant were not voluntary. When Officer Carroll testified at trial the objection was "for the reasons set out in the pretrial motion to suppress and the reasons mentioned earlier when Officer Stark was called to testify." He then testified to statements made to him by appellant which included everything that we have set out as being said by him to Officer Stark before the *Miranda* warnings were given.

Under these circumstances the admission in evidence of any of the above statements made by appellant to Officer Stark prior to receiving the *Miranda* warnings was harmless beyond any reasonable doubt. See *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Those statements are not contended to be incorrect or involuntary, and were cumulative to other statements of appellant made after he received the *Miranda* warnings and had signed the written waiver.

Appellant also contends that the statements made by him to Officer Stark and Officer Carroll after he received the *Miranda* warnings should have been excluded as "fruit of the poisonous tree." We note first that our view is that there was no "poisonous tree," and second, this contention was not advanced in appellant's motion to suppress and it was not the basis of an objection to the admission of the testimony. However, in any event, the contention is without merit.

In *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the court stated that not all evidence is " 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." The court pointed out that "the more apt question" in such a case is " 'whether, granting establishment of the primary illegality, the evidence to which * * * objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

We are of the opinion, as previously stated, that the *Miranda* warnings were given as soon as they were required. In that event, the doctrine of the "fruit of the poisonous tree" could not apply. However, assuming that they should have been given earlier as previously assumed, no prejudice resulted, and there was no exploitation of the information obtained before the *Miranda* warnings were given. It was when Officer Stark was informed of appellant's prior confessions of guilt made to third persons that the *Miranda* warnings were given and incriminating information was thereafter obtained. Appellant was completely cooperative, no improper means were employed by the police officers, and there is no contention that any statement made subsequent to the *Miranda* warnings was not completely voluntary. We conclude that the doctrine of the "fruit of the poisonous tree" is not applicable to the facts of this case.

Appellant's remaining point is that the court erred in sustaining the State's challenges for cause of five veniremen because they were "qualified to serve and did not indicate an inability, under any circumstance, to vote for a sentence of death."

The substance of appellant's contention is that we should extend the prohibition against disqualification of veniremen, who voice general objections to capital punishment, to this case in which the death penalty was not imposed. See *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We need not set forth the answers given by the venireman on voir dire, but we are of the opinion that the five who were excused as the result of challenges by the State were properly excused pursuant to the rule announced in the *Witherspoon* case. But, in any event, the United States Supreme Court and this Court have each rejected an extension of the Witherspoon-type restrictions to cases where the death penalty is not imposed. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *State v. Wallace*, 504 S.W.2d 67 (Mo.1973), cert. den. 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 76 (1974); *State v. Borden*, 605 S.W.2d 88 (Mo. banc 1980). We are not persuaded that the rule announced in the above cited cases should not be followed.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the court.

HIGGINS and WELLIVER, JJ., concur.

SEILER, P. J., concurs in separate concurring opinion filed.

SEILER, Presiding Judge, concurring.

I concur in the affirmance of the judgment, but this is another case, as were *State v. Holmes*, 609 S.W.2d 132 (Mo.1980) and *State v. Hudgins*, 612 S.W.2d 769 (Mo.1981), where in order to enable us to carry out our statutory duty of determining whether death sentences are "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant", § 565.014.3(3), RSMo 1978, our opinion must contain a statement of the facts, even though the penalty assessed was life without parole or probation for fifty years rather than death.

The case before us involves three counts of capital murder. The state sought the death penalty but the jury, while finding defendant guilty of capital murder on each of the three counts, rejected the death penalty as to the first two counts, imposing a sentence of life imprisonment without parole or probation for fifty years as to Count I and Count II, but was unable to agree on the punishment as to Count III. The trial court, then per § 565.006.2, imposed sentence of imprisonment for life without parole or probation for fifty years on Count III.

In accord with the principle of keeping a record of the facts of these cases as the law is built up in this area, the following condensation is given of what was before this jury, which in two instances chose to assess the punishment at life without parole for fifty years and rejected the death penalty, and which, in the third instance, was unable to agree on punishment. The jury could have found from the evidence the following facts in addition to those set forth in the second paragraph of the principal opinion: defendant, a nineteen year old black male, using a .22 caliber pistol, murdered three black victims. He shot James Harris (Count II) apparently because he wanted a gun that Harris had. Harris was shot once in the back and once in the head. His sister, Mrs. Vicki Kanion, a medical student (Count I), came running into the room where her brother had been shot and defendant shot her in the head. Mrs. Kanion's seven year old son, Ernest Booker (Count III) came out from somewhere and called out defendant's name. Defendant said, "I am going to have to kill you too," after which the little boy crawled under a table and begged for his life. Defendant said, "Come here. I've got a surprise for you." He then shot the little boy in the head.