STATE of Missouri, Appellant,

v.

Darrell Wayne CROSS, Respondent.

No. WD 38974.

Missouri Court of Appeals,
Western District.

July 12, 1988.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 30, 1988.

Application to Transfer Denied
Oct. 18, 1988.

Jerome S. Antell, III, Asst. Pros. Atty.,
Columbia, appellant.

Milt Harper, Columbia, respondent.

Before TURNAGE, P.J., and
BERREY and GAITAN, JJ.

TURNAGE, Presiding Judge.

Appeal by the State from an order suppressing evidence of the presence of a gun under the driver's seat of an automobile. Order suppressing such evidence is reversed and cause remanded.

The facts are not in dispute. About 11:00 p.m. on March 1, 1986, Officer McCrary went to the Deja Vu in Columbia as a result of a report that someone had drawn a knife on another person at the door of the night club.[1] The suspects were described to McCrary as two black males, one approximately 5' 7" in height and wearing a black jacket. These men were last seen a few seconds before the officer arrived running south on Seventh Street. The officer began to search the area in his patrol car and, within three to four minutes after receiving the report, saw a vehicle going past Deja Vu with two black males, and the driver was wearing a black jacket. The officer started following the vehicle and checked its registration number and

---

1. While the incident was described as being a disturbance, there is no dispute that information was given to the officer that one of the suspects had pulled a knife on another person. This would be sufficient to give the officer reasonable suspicion that the felony of assault in the second degree had been committed. Section 565.060, RSMo 1986. Such assault may be committed by an attempt to cause physical injury to another person by a deadly weapon or instrument. Cross does not contend otherwise.

learned that the owner was Darrell Cross. When the name of Cross was broadcast, another officer came on the air to advise that Cross was known to carry weapons.

Officer McCrary stopped the Cross vehicle and ordered Cross and his passenger to stay in the car. Officer McCrary waited for another car to arrive.

On the arrival of the second police car, McCrary asked Cross to step out of the car and show some identification. While Cross was outside the car, another police officer arrived and immediately performed a search of the passenger compartment of the vehicle. That officer found a 25 caliber automatic handgun under the driver's seat. When the gun was found, McCrary performed a pat-down of Cross and found a 25 caliber automatic clip and bullets in his left front pocket. Cross was subsequently charged with carrying a concealed weapon.

■ On appeal by the state as authorized by § 547.200, RSMo 1986, the correctness of the trial court's decision is measured by whether the evidence is sufficient to sustain the findings. *State v. Blair*, 691 S.W.2d 259, 260[2] (Mo. banc 1985).[2] This case does not present any conflict in the evidence so the evidence can only be stated as it was presented. Thus, the only test to be applied is whether or not the evidence is sufficient to sustain the finding that evidence of the presence of the gun under the seat be suppressed.[3]

■ The first question presented is whether or not Officer McCrary had any legal justification to stop the Cross vehicle. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), first recognized the right of police officers to make an investigatory stop. In *State v. Fernandez*, 691 S.W.2d 267, 269[1–4] (Mo. banc 1985), the

court stated that *Terry* recognizes the need for immediate stops even when there is no probable cause for arrest. A *Terry*-type stop has been extended to include the stop of a motor vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). In *State v. McCabe*, 708 S.W.2d 288, 290[1] (Mo.App.1986), it was held that a police officer may stop a vehicle for investigative purposes although no probable cause to arrest exists.

*Fernandez* held that *Terry* requires that the stop be justified at its inception. Quoting *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 681, 83 L.Ed.2d 604 (1985), *Fernandez* stated:

> "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved or is wanted in a completed felony, then a *Terry* stop may be made to investigate that suspicion."

691 S.W.2d at 269[5–7]. *Fernandez* further held that the circumstances surrounding the stop do not have to exclude the possibility of innocent behavior. *Id.*

In *State v. Lasley*, 583 S.W.2d 511, 518 (Mo. banc 1979), the court quoted from *Terry* that reasonable suspicion entitles an officer to stop an individual "when the officer is 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" The court further stated that the standard by which reasonable suspicion is gauged "is whether the facts available to the officer at the moment of the seizure warrant a person of reasonable caution in the belief that the action taken was appropriate." *Id.*

**2.** The dissent makes much of the question of the standard of review in this situation. *Blair* states the rule governing review by this court on appeals by the state under § 547.200. This court is bound to follow the last controlling decision of the supreme court. Art. 5, Sec. 2, Const. of Mo. 1945. Further, the parties present this appeal on the question of whether or not the officer was justified in stopping the car based on the presence of two black males, one wearing a black jacket. Thus, the parties join issue on whether or not the facts support the order of

suppression. This coincides with the test set out in *Blair*.

**3.** The dissent introduces a new test for review on the basis of whether the trial court order is affirmed or reversed. It states that the order may not be reversed unless it is clearly erroneous. No Missouri case has held that there is a different standard for reversal. Support is found for this new rule in federal cases. In view of *Blair*, these cases are inapplicable.

The resolution of the question of whether or not Officer McCrary had a reasonable suspicion that justified an investigative stop of the Cross vehicle involves the determination of whether or not a person of reasonable caution would believe the action taken was appropriate. The action of Officer McCrary meets that test.

The evidence was that it was 11:00 p.m. and that Officer McCrary did not see any other black males in the vicinity of Deja Vu. Certainly the fact that Cross and his passenger were black did not justify a stop. However, given the lateness of the hour, that Officer McCrary did not observe any other black males in the area of the Deja Vu, the fact that the suspects were described as two black males with one wearing a black jacket, and the presence of two such individuals in a car passing the Deja Vu within three to four minutes after the report of the assault, leads to the conclusion that a person of reasonable caution would believe that it was appropriate to make an investigative stop of the Cross vehicle.

There is no significance in the fact that McCrary followed the Cross vehicle for some distance. He never lost sight of the Cross vehicle, and he was justified in trying to learn some information about the ownership of the vehicle before he actually stopped it. The stop was justified under the test articulated in *Terry* and *Lasley*.

■ The second question concerns the propriety of the search of the passenger compartment after the stop. In *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Court held that after an investigative stop the officer may conduct a search of those areas of the passenger compartment of the automobile in which a weapon may be placed or hidden "if the police officer possesses a reasonable

belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. at 1049, 103 S.Ct. at 3481, 77 L.Ed.2d at 1220. The Court quoted from *Terry*: " '[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' " *Id.*

The Court held in *Long* that an officer conducting a legitimate search of the interior of the automobile cannot be required to ignore contraband which he may discover. *Id.*

In this case, the question is whether or not the police officers were reasonably warranted in believing that Cross was dangerous and might gain immediate control of weapons. Clearly the officers were justified in believing that Cross was dangerous because the incident they were investigating involved the drawing of a knife on another person and because of the information which was broadcast that Cross was known to carry weapons. A *Terry* search of the interior of the automobile was fully justified.[4]

Under *Long*, the officers were not required to ignore the presence of the gun under the driver's seat when they conducted a *Terry* search.

To sustain the trial court's suppression of the evidence, this court is required to find the evidence sufficient to conclude that the stop and search were not authorized by law. Because the evidence is insufficient to support such a finding, the order of suppression must be reversed. The order suppressing evidence of the presence of the gun under the seat is reversed, and this

**4.** The dissent is critical of what it perceives to be a failure to accord deference to the trial court on the question of credibility of witnesses. The only evidence was the testimony of Officer McCrary and Officer Cannady, who searched the car. During the hearing, counsel for Cross admitted that a gun was found under the seat. *Counsel did not dispute any material fact testified to by the officers, either in the trial court or* in this court. Nor was there any attack on their credibility. In fact, the defense is based on the same facts presented by the officers, with the conclusion that such facts were insufficient to justify the stop and seizure. It is sheer speculation and flies in the face of the argument presented to say that the trial court's ruling is based on a disbelief of the officers' testimony.

cause is remanded with directions to admit such evidence.

GAITAN, J., concurs.

BERREY, J., dissents in separate opinion.

BERREY, Judge, dissenting.

I respectfully dissent.

The issue raised in the present case is stark and simple: Does being a black man who is wearing a black jacket and driving a car with a black companion near a crime scene give a police officer reasonable suspicion to justify the stop of the black man's car? The majority would have us believe so but after a thorough review of the facts in this case the majority position is clearly untenable.

Just after 11:00 p.m. on March 1, 1986, Officer McCrary of the Columbia, Missouri Police Department received a call to go to the Deja Vu, located at the northeast corner of Seventh and Cherry. The call indicated a disturbance and a suspect with a knife. McCrary arrived on the scene in fifteen (15) seconds as he was just around the corner. McCrary talked to the manager and was told that the suspect had just left. The manager said one was about five foot seven and wore a black jacket. Two persons were apparently involved, both black males, but the transcript is woefully short of testimony to elaborate further.

McCrary said he learned that "they just pulled a knife on somebody at the door and that was it." McCrary testified he did not know when the event happened. McCrary then put out the information he'd received on the radio to all officers. He was told the suspects were last seen running south on Seventh street.

McCrary then "cleared the area" and started looking around. He drove south on Seventh and "started looking around the area the way they ran and then came back through the same area." McCrary then observed a vehicle westbound on Seventh at Cherry, in front of the Deja Vu, containing two negro males, the driver wearing a black jacket. This car was observed by McCrary three or four minutes after he had received the initial call. McCrary had no other information regarding the suspects.

McCrary's testimony leaves no doubts as to why he followed Cross:

Q. All right. So you'd made up your mind that these two black males were the ones with the weapons at Deja Vu; is that right?

A. Didn't know until the car was searched.

Q. And you stopped that car because you had the description of two black males and one with a black jacket; is that right?

A. Correct....

....

Q. So the only thing that caused you to stop was two black males and one with a black jacket we've established; is that correct?

A. Correct.

McCrary stated he could not tell the height of the occupants of the car. On the facts set forth above McCrary began following the car.

The following questions and answers shed additional light upon this officer's ability to observe and recall:

Q. Well, how close behind that car were you during this time from Deja Vu clear out to the circuitous route to Hickman High School?

A. No other car ever got between us. You know, just a regular, regular following length.

Q. How much distance is that?

A. How much distance?

Q. How far is it? Isn't that several miles?

A. From?

Q. From where this route that you've told us that you followed this car from in front of Deja Vu down to 5th over to Broadway, clear out Broadway, clear out Garth over to Worley, back down to I think across 5th, across Providence over there, end up. Isn't that several miles?

A. I don't know how far it is.

Q. Well, you're an experienced police officer, and I just want your opinion. And I think you're qualified to give that. Isn't that several miles?

A. I don't know. It's a certain distance. I don't know how many miles it is.

Q. Well, am I correct in assuming it's several miles; isn't that true?

A. I don't know.

Q. Aren't on you [sic] patrol frequently, sir?

A. Yes.

Q. Do you know how much a mile is approximately?

A. Yeah, pretty much, yes.

Q. Isn't it a fact that you followed them for several miles? I'm not trying to trick you. I mean, isn't that simply the fact?

A. I don't, I don't know how far it was. I don't know how far it was.

Q. I understand that. But isn't it true that you followed them for several miles?

MR. ANTEL: Judge, I'll object. It's been asked and answered. If he doesn't know, he doesn't know.

THE COURT: The objection will be sustained.

Q. How much time did this following them take?

A. I don't know.

MR. HARPER: Well, Judge, you know, this officer comes in here and doesn't know anything.

THE COURT: Ask your question. I sustained the last objection. I haven't sustained one on this one.

Q. How much time does it take? You're an experienced officer. You must have some memory of this. In your best judgment, how long did this take from the time you left Deja Vu until you pulled them over? How much time?

A. I don't know exactly.

Q. Sir, I understand you don't know exactly. I didn't ask you exactly. What's your best judgment?

A. Five minutes.

Q. Sir, wouldn't it have been more like twenty, twenty-five minutes if they slowed down and didn't break the speed limit and took all this route through the west side of Columbia and clear back to the east side of Columbia? Did they stop for any stop lights?

A. Yes. We stopped—

Q. How many stop lights did you stop for?

A. I have to start from the start and go from 7th and Cherry, and I could tell you that and count from there.

Q. Let me ask you this if we have got to do it this way: How long is a stop light in Columbia?

A. I don't know.

MR. ANTEL: Judge, I'll object to that.

MR. HARPER: Judge, he said five minutes.

THE COURT: You may ask him if he knows.

MR. ANTEL: Judge, I'll object to the form of the question. There are hundreds of stop lights in this town. I don't know of any stop light signal—

THE COURT: He can answer the question.

A. You're asking me how long a stop light is?

Q. What's the average stop light?

MR. ANTEL: Judge, an average stop—Never mind.

Just answer the question.

A. Well, some lights are longer than others. I don't know.

Q. I understand that. Give me your range.

A. A minute.

Q. How many stop lights did you encounter between the time you left Deja Vu to the time you made this stop between the time you pulled the car over?

A. I don't know how many we stopped at. Some of them were green.

Q. How many did you stop at do you think?

A. Oh, I don't know. I mean, maybe two. I don't know.

Q. Officer, is it possible you followed that car for twenty, twenty-five minutes?

A. No.

Q. You're positive?

A. We didn't follow—I didn't follow it for no twenty-five minutes.

Q. You know that for a fact?

A. No. It don't take that long.

Q. How close to that car were you when you followed it?

A. I don't know, a couple car lengths.

The majority is correct as to the question it presents as to Officer McCrary's legal justification for the stop of the Cross vehicle. Unfortunately the answer given to the question by the majority ignores fundamental legal principles. There has always existed a Constitutional prohibition against warrantless searches. The exceptions to this prohibition are narrowly and carefully drawn so as to judiciously protect the rights of all citizens from the intrusion of the state into their private lives. This is why we have a Fourth Amendment. Here the warrantless search of defendant's car clearly violated the Fourth Amendment. The search does not fall under any exception carved out thus far.

The majority justifies the search as a *Terry* stop. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Terry* allows officers the right to make an investigatory stop without probable cause. This does not give police *carte blanche.* In *State v. Fernandez,* 691 S.W.2d 267 (Mo. banc 1985), the court says that there must be "reasonable suspicion" on the part of police, "grounded in *specific and articulable facts,* that a person they encounter was involved or is wanted in a completed felony...." *State v. Fernandez,* 691 S.W.2d 267, 269 (Mo. banc 1985) (emphasis added) (quoting *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 681, 83 L.Ed.2d 604 (1985)).

There can be no doubt that all warrantless searches, subject to well defined exceptions, are unconstitutional per se. *State v. Blair,* 691 S.W.2d 259, 260 (Mo. banc 1985). The state bears the burden of establishing that search and seizure are within an exception to the warrantless search rule. In the instant case, the state argues the officer had probable cause to believe defendant was carrying a concealed weapon. However, the officer himself speaks of only a suspicion that the party might be carrying a weapon due to a radio dispatch. The search incident to a lawful arrest exception to the warrant requirement presumes a valid custodial arrest. "Absence of probable cause to take a suspect into custody triggers the 'full protection' of the fourth Amendment." *State v. Jacobs,* 704 S.W.2d 300, 301 (Mo.App.1986). Probable cause to arrest one without a warrant simply means a knowledge of facts and circumstances sufficient for a prudent person to believe a suspect is committing or has committed a crime. *State v. Fain,* 679 S.W.2d 419, 423 (Mo.App.1984).

In *United States v. Taylor,* 428 F.2d 515, 519 (8th Cir.1970), *cert. denied,* 401 U.S. 983, 91 S.Ct. 1208, 28 L.Ed.2d 335 (1971), the court noted that probable cause for a warrantless arrest exists when facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that the suspect has committed or is committing a particular crime in the officer's presence. Nothing in the report the officer received or that which occurred in the officer's view or presence gave rise in this case to justifying the stop and subsequent search. *See State v. Cuezze,* 249 S.W.2d 373, 375 (Mo.1952). How can reasonable suspicion be developed from viewing two black males, in a car, coming from a different direction three or four minutes after the alleged incident? The facts fail to rise to reasonable suspicion, suspicion, or anything else short of fate that these two men happened by.

The majority cites *State v. McCabe,* 708 S.W.2d 288, 290 [1] (Mo.App.1986), as supportive of its position. I submit nothing in the facts in McCabe justifies such a conclusion in this case. In *McCabe,* the police were investigating a series of burglaries and had received names of three suspects, a description and the license plate number of the vehicle allegedly used in burglaries from another police department. Details of the modus operendi were also furnished; the operation involved prying open front doors with a tool and carrying off property

in a pillow case. When the car in question was stopped, the officers saw, through an open car door, a tire tool, black gloves, flashlight, street directory, channel locks and a pillow case partially tucked under a seat. Looking in the pillow case, the officer saw money and jewelry. In *McCabe*, the initial stop was justified based on the particular objective facts which taken together with reasonable knowledge of the officers inferences, from the facts, warrant the intrusion. *Id.* In the instant case no facts presented themselves from which McCrary could conclude that it was necessary for him to follow the suspects.

The following testimony given on cross-examination by McCrary describing events after the stop is of note:

Q. Did you see his face?

A. Saw his face then, yes.

Q. Did you know it was Darrell Cross?

A. Yes.

Q. Is that when you asked him for his ID?

A. Asked for identification, yes.

Q. Why did you ask for identification if you knew who he was?

A. What I usually do—

Q. Why did you ask him for identification if you knew who he was?

MR. ANTEL: Judge, I object. I think Officer McCrary tried to answer the question. Mr. Harper interrupted him.

THE COURT: You may answer.

A. When you get the driver's license, you don't have to watch the—you can watch the person. These guys supposably had weapons. I can read off the license plate, read the name off to the people at communications without taking my eye off of him.

Q. Who told you these guys had weapons?

A. We had suspicion they had weapons.

Q. Who is we?

A. All the officers that were at the scene, the ones.

Q. You told them you were following this car, didn't you?

A. Uh-huh, yes.

Q. So they were there because you told them; right?

A. Correct.

Q. Because you were the one that found this green car; correct?

A. Correct.

Q. Were other police cars following the green car with you?

A. No.

Q. All right. So you'd made up your mind that these two black males were the ones with the weapons at Deja Vu; is that right?

A. Didn't know until the car was searched.

Q. And you stopped that car because you had the description of two black males and one with a black jacket; is that right?

A. Correct. Five seven, approximately five seven.

Q. But approximately five seven, but that didn't enter into your stop, did it?

A. I didn't know how tall he was, no.

Q. So the only thing that caused you to stop was two black males and one with a black jacket we've established; is that correct?

A. Correct.

Q. All right. And nobody else told you that those guys had weapons, did they? You just thought that; is that correct?'

A. Yes, just suspicion, yes.

Q. All right. Other than the fact they were two black males, other than the fact that one of them had on a black jacket, what other suspicion did you know, did you have that those were the two guys who had weapons at Deja Vu?

A. That was all the suspicion I had.

Q. All right.

A. And other than—

Q. You said weapons—

MR. ANTEL: Judge, he cut him off again.

MR. HARPER: I didn't understand. I thought he was finished.

MR. ANTEL: He said and. I think he was going to say something else.

THE COURT: Ask another question. I think he finished his answer. Go ahead, Mr. Harper.

MR. HARPER: All right.

Q. You keep saying weapons. The guys that had the weapons. I thought you told us awhile ago the manager said one black male had a knife.

A. That's what I mean. Knife. Weapon.

Q. So you meant weapon?

A. Yeah, weapon.

Q. All right. Now, did you stop the green car to arrest anybody?

A. No.

Q. Why did you stop the green car?

A. To check to see if the subject inside had weapons—a weapon anyway, not weapons.

Q. So you stopped the car to see if someone had a weapon?

A. (Responded by nodding his head up and down.)

Q. Did you tell Mr. Cross he was under arrest?

A. Didn't arrest him when I got him out of the car, just told him what we had.

Q. So you stopped the car to see if there was a weapon; is that correct?

A. Yes.

Q. Were you going to search the car?

A. Yes.

Q. Okay. Did you ask Mr. Cross if you could search the car?

A. No, I didn't.

This testimony makes it painfully obvious that although Officer McCrary knew Cross he did not recognize him as the driver of the car and thus his knowledge is not a part of the "reasonable suspicion" found by the majority. All he saw was two black men in a car and could not identify the defendant.

Also cited by the majority is *State v. Fernandez*, 691 S.W.2d 267, 269 (Mo. banc 1985). In *Fernandez*, the police dispatcher sent officers to a specific location based on a telephone tip of "a woman screaming and parties armed." The officer arrived and found a car parked in the immediate vicinity of the reported disturbance. The officer instructed the parties to exit the car and they did. When the officer looked in the car, defendant Fernandez suddenly darted past the officer and grabbed her purse. The officer told her to put it back in the car. Instead, she clutched it to her person. The officer then ordered her to give it to him. She drew it back as if to strike him. Fearing a gun might be in the purse, the officer at this juncture took possession of the purse, opened it and found drugs. The Missouri Supreme Court held "*Terry* requires that the stop be justified at its inception" and that there were sufficient facts to make the justification for the stop. *Id.* at 269. In the instant case, the inception was when McCrary's police cruiser was behind defendant's car at the Deja Vu. The majority attaches no significance to the fact that McCrary followed the defendant car for some fifteen to twenty minutes and that this was justified because he was attempting to learn more about the vehicle before he stopped it. The majority would justify this action because the hour was late, (approximately 11:00 p.m. in Columbia)[1] and that McCrary did not observe any other black men in the area. The majority ignores the state's evidence that McCrary acknowledged the only reason he followed the car was it contained two black males, one in a black jacket. The occupants did not look around at the officer or look suspicious, and no driving errors were committed while he was following them.[2]

The majority finds that the stop was justified and then goes on to examine the propriety of the search of the passenger compartment of the automobile under the principles articulated in *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). We need not reach this argument as the initial *Terry* stop was clearly without justification, however a brief discussion will serve to point out the error compounded by the majority.

1. *Obviously,* 11:00 p.m. might be late in some areas—in a university town such as Columbia this is arguable.

2. In and of itself a rarity!

Assuming *arguendo* that the initial stop was proper it is still improper to reverse the order of suppression as the search was illegal. At an investigative stop a police officer may conduct a search of the passenger compartment of the vehicle only when he has a reasonable belief supported by specific and articulable facts that a suspect is dangerous and may gain immediate control of a weapon. *Michigan v. Long, supra.*

When Officer McCrary received a radio broadcast informing him that Cross was known to carry weapons he had not recognized Cross as the driver of the car although he knew Cross! He had no idea that Cross was even in the car. Officer McCrary admitted that he did not recognize Cross until after he had Cross step out of the car. Officer McCrary even concedes that his purpose in stopping the car was to see if there was a weapon.

Officer McCrary testified that after the stop he saw Cross stick his hands out the window "to show me that he was probably unarmed." At the time of the search Officer McCrary had Cross at the rear end of the vehicle. The other black male from the car was out on the sidewalk speaking to Officer McGuire who had arrived after the initial stop. Yet a third officer, Officer Cannaday went directly to the car and searched it. He found a .25 caliber automatic. It was then that Cross was arrested and handcuffed. Incidentally, a knife, the weapon described as used in the crime being investigated was never found.

In *Michigan v. Long, supra,* the officers saw a large knife in the interior of a car in which the suspect was about to re-enter. The court justified the search on the grounds that Long may have been able to break away and get the knife they knew was there or upon being given permission to re-enter gain control of the knife and attack. The instant case is easily distinguishable. Here there was no sign of any weapon. Officer Cannaday merely went to

the car and proceeded to search. There was no indication that the officers felt that they were in imminent peril.

The majority opinion glosses over the fact that in every case, especially a court-tried case, the judge is determining, among other things, credibility. The mere fact that there is no dispute in the evidence is not germane or persuasive. The trial judge heard the testimony of Officer McCrary and from the ruling it is obvious that the trial judge did not believe the officer had reasonable suspicion to proceed with the stop.[3] It is painfully clear that the majority assumes the truthfulness of Officer McCrary—a luxury they are not permitted.

This court is limited in its review of the trial court's ruling on the motion to suppress to a determination of whether or not there was sufficient evidence to justify the finding. *State v. Blair,* 691 S.W.2d 259, 260 (Mo. banc 1985); *State v. Baskerville,* 616 S.W.2d 839, 843 (Mo. 1981); *State v. Dees,* 639 S.W.2d 149, 154 (Mo.App.1982). The trial court weighs the evidence and determines the credibility of the witnesses. Absent abuse of this discretion the trial court's ruling on admissibility of evidence will not be disturbed on appeal. *State v. Pennington,* 687 S.W.2d 240, 242 (Mo.App. 1985). Upon review of a trial court order, the facts and reasonable inferences arising therefrom are to be stated favorably to the order challenged on appeal. The reviewing court is free to disregard contrary evidence and inferences, and is to affirm the trial court's ruling on a motion to suppress if the evidence is sufficient to sustain its finding. *State v. Blair,* 691 S.W.2d 259, 260 (Mo. banc 1985); *State v. Jacobs,* 704 S.W. 2d 300 (Mo.App.1986).

The majority cites *State v. Blair,* 691 S.W.2d 259, 260 (Mo.1985), as supportive. In *Blair,* the police arrested defendant, a suspect in a murder investigation, on an outstanding city warrant for a traffic viola-

---

**3.** The majority ignores all facts and circumstances leading up to the search. The only reasonable conclusion to be drawn from the evidence is that the police followed two black males, one in a black jacket and later stopped

them and searched their car. It is clear that the trial court did not approve of this procedure when it sustained defendant's motion to quash. *See Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).

tion. She was arrested; taken to police headquarters; booked on the homicide; her palm and fingerprints taken; and interrogated about the murder. Defendant was held over night and released. Fourteen minutes after her release she was booked on a city parking warrant, posted bond and was released. Later the police established her palm print matched the one found at the scene and she was arrested on a warrant charging her with murder. She gave an inculpatory statement. Following an evidentiary hearing on her motion to suppress the trial court sustained her motion. The state filed an interlocutory appeal pursuant to 547.200 RSMo 1983, and this court affirmed. The supreme court granted transfer and affirmed the trial court. The subterfuge in *State v. Blair, supra,* was the arrest on an outstanding city parking warrant. In the instant case, the radio dispatch received by officer McCrary revealed the car was owned by Darrell Cross, later identified as defendant, who was known to carry weapons; this does not give rise to reasonable suspicion. At the time no one knew who was driving the car. The court in *State v. Blair,* also emphasized the standard of review: "the reviewing court is free to disregard contrary evidence and inferences, and is to affirm the trial court's ruling on a motion to suppress if the evidence is sufficient to sustain its findings." The majority opinion fails to understand this concept as set forth in *State v. Blair, supra.*

It is regrettable that the trial judge did not make findings of fact but that omission does not change the facts. It is obvious, however, that the trial judge was not impressed with the state's theory, else he would not have quashed the evidence. The trial court's order is not "clearly erroneous." *U.S. v. Bentley,* 706 F.2d 1498 (8th Cir.1983), nor is it "manifestly erroneous" *State v. Brown,* 698 S.W.2d 9 (Mo.App. 1985). The order may only be clearly erroneous if upon review of the entire record, this court is left with a definite and firm impression that a mistake has been made. *Wickman v. State,* 693 S.W.2d 862, 866 (Mo.App.1985).

The majority opinion conflicts with *State v. Baskerville,* 616 S.W.2d 839 (Mo.1981), and the line of cases thereunder because a reviewing court may not reverse the decision of a trial court unless that ruling is clearly erroneous or manifestly erroneous. This standard has been disregarded in the present case. The standard of review is no different in a search and seizure suppression case than in that involving other kinds of suppressed evidence. Further, *State v. Peterson,* 583 S.W.2d 277 (Mo.App.1979), and the line of cases thereunder illustrate the error of the majority as these cases make clear that although a trial court makes no express findings of fact it is still entitled to accept or reject a witness' testimony on the grounds of credibility. That determination binds this court. The judgment of the trial court should be sustained.