**STATE of Missouri, Plaintiff/Appellant,**

v.

**George E. COCHRAN, III, Defendant/Respondent.**

**No. WD 40751.**

Missouri Court of Appeals, Western District.

March 21, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 2, 1989.

Application to Transfer Denied June 13, 1989.

Robert Frager, Asst. Pros. Atty., Kansas City, for plaintiff/appellant.

Justine E. Del Muro, Asst. Public Defender, Kansas City, for defendant/respondent.

Before FENNER, P.J., and SHANGLER and BERREY, JJ.

FENNER, Presiding Judge.

This is an appeal by the State from an order suppressing evidence and statements regarding evidence found on Respondent's person at the time of his arrest, as well as a videotaped statement made by Respondent after he was taken into custody. The trial court found that the Respondent was arrested without a warrant for carrying a concealed weapon and that the arrest was a

pretext disguised to hold Respondent for a homicide investigation.

At the hearing on Respondent's Motion to Suppress the trial court heard testimony from eight police officers in regard to two different investigations. The fact that there were two different investigations taking place at the same time requires a lengthy factual recitation to determine whether the evidence supports the trial court's order.

The first officer to testify on Respondent's Motion to Suppress, was Ron Barney, Chief of Detectives of the Jackson County Sheriff's Department. Detective Barney testified that he was in charge of a Metro Squad investigation of a double homicide which occurred on or about December 13, 1986, just east of Oak Grove, Missouri, in Eastern Jackson County. Detective Barney was supervising the efforts of 25 officers from various jurisdictions in relation to the double homicide. Detective Barney became involved in the investigation on Saturday, December 13, 1986. The first meeting of the Metro Squad was on Sunday, December 14, 1986, at which time Detective Barney advised the other members of the Metro Squad that the two homicide victims had both apparently been shot in the head with an unknown caliber weapon, the crime had taken place at a possible drug house, drugs had been found at the scene of the crime and it was believed that a considerable amount of money had been taken from the scene of the crimes.

Detective Barney testified that at about 11:30 p.m. on December 14, 1986, he either received a call from a Laura Deaton or returned a call from her and she told him that she knew somebody who she believed had killed the two people in the case the Metro Squad was investigating. Laura Deaton told Detective Barney that she believed the killer was staying in her house, later identified as 943 North Iowa, Olathe, Kansas, and that he had a weapon. Ms. Deaton further said that the person she suspected, who was later determined to be the Respondent, had left her house and gone to Bates City, which is approximately 3 miles from Oak Grove, and when he left

he had no money but when he returned he had a large amount of money, narcotics and a weapon.

The next morning on December 15, 1986, Detective Barney was in the process of briefing the Metro Squad on his conversation with Laura Deaton when he received a call from Lieutenant Larry Griffin who was with the Police Department of the City of Olathe, Kansas. Lieutenant Griffin advised Detective Barney that Laura Deaton and a male companion were at the Olathe Police Station making basically the same statements that Ms. Deaton had made to Detective Barney.

Detective Barney sent several teams of officers to Olathe to survey the address where Respondent was reported to be living, thinking that there might be probable cause for an arrest. By the time Detective Barney felt there might be probable cause for an arrest he knew that the victims had been shot with a small caliber weapon and that Respondent had such a weapon, that Respondent had been in the area at the time of the homicides and that there was a bank bag in Respondent's room.

The next officer to testify was James Stover, who was with the Olathe Police Department. At 7:26 a.m. on December 15, 1986, Officer Stover was dispatched to 943 North Iowa, along with two other officers, to check on the welfare of a Steve Pippin, who was living at that address. Officer Stover was advised that the Olathe Police Department received a call from Pippin's employer who wanted someone to check on Pippin because Pippin had stated that he was in danger from a possible murder suspect. At the time he was dispatched, Officer Stover did not have any information about the Metro Squad investigation.

When Officer Stover and the other two officers arrived at 943 North Iowa they saw a man and woman leave the address, get into a vehicle and start to leave the area. Officer Stover stopped the vehicle and discovered the parties to be Steven Pippin and Laura Deaton. Pippin and Deaton were very upset and said they needed police assistance because they believed Pippin's cousin, the Respondent, who had been

staying with them, was a murder suspect. They named the Respondent, described him and said he had been staying with them for about the past two weeks and that he had gone to 306 South Church Street in Olathe. Officer Stover gave this information to Patrolmen Donnell and Biddulph who went to 306 South Church Street and set up surveillance.

Stover went back to 943 North Iowa with Pippin and Deaton and continued to question them. Pippin and Deaton told Officer Stover that when the Respondent came to stay with them he didn't have any money. Pippin gave Respondent a ride to I-70 and the Arrowhead Stadium exit on December 10, 1986, so that Respondent could hitchhike to St. Louis where he was to get a car. On Saturday, December 13, 1986, Respondent showed up at 943 North Iowa, on foot and carrying a knapsack, saying that the vehicle he had gone after had broken down and he hitchhiked back. Upon his return Respondent also had a large amount of cash, drugs and a handgun. Pippin said the Respondent was acting very strangely, nervous, pacing the floor, and looking out the window. When Respondent heard a news broadcast of the Oak Grove homicides he became more anxious.

Laura Deaton's name was on the lease of the premises and she consented to a search. Officer Stover was taken into the basement area where the Respondent had been staying where he found some marijuana, a semi-automatic pistol, a money bag with some plastic bags inside and a spent shell casing. Pippin advised Officer Stover that the gun Officer Stover found was not the gun the Respondent usually carried on his person.

Officer Stover radioed Patrolmen Donnell and Biddulph and advised them that Respondent was believed to be armed with a .25 caliber automatic weapon which he usually carried in his waistband or his boot. Officer Stover also told the patrolmen that he had found marijuana and described what the Respondent had been wearing.

The third officer to testify was Chief of Police Jimmy Luster of the Belton, Missouri Police Department. Chief Luster

was assigned to the Metro Squad investigation and on December 15, 1986, he went to the Olathe Police Department to interview a David Livings. David Livings lived at 306 South Church Street in Olathe which is the address that Respondent had gone to, according to Pippin and Deaton, upon leaving their residence. Livings told Chief Luster that Pippin informed him that the Respondent had some involvement in the homicides under investigation. Livings also said the Respondent had a .22 or .25 caliber pistol in his boot. Chief Luster passed this information on to the Olathe Police Department as well as to his Metro Squad commander. Chief Luster also obtained a written consent to search the premises at 306 South Church Street.

The fourth officer to testify was Detective Thomas Phillips of the Jackson County Sheriff's Department who was also participating in the Metro Squad investigation. Detective Phillips talked to Mr. Pippin on Monday, December 15, 1986, and obtained basically the same information as Pippin had given to the other officers. Detective Phillips did not relay the information he received to anyone.

Detective Phillips also testified that he interviewed Respondent after Respondent "had been arrested by the Olathe Police Department on a weapons charge, narcotics charge, and was brought to their station." Detective Phillips advised Respondent of his Miranda rights. Respondent stated that he understood his rights and Respondent was then interviewed. The interview lasted approximately one hour and forty-five minutes, starting at about 3:00 p.m. During the interview, two other Detectives asked Respondent to sign a waiver to allow them to search the premises at 943 North Iowa Street at which time Respondent requested an attorney and the interview was concluded.

The next officer to testify was Corporal Bob Carr of the Leawood, Kansas Police Department who was also a member of the Metro Squad. On December 15, 1986, Corporal Carr met with Officer Stover, went to 943 North Iowa in Olathe, saw the handgun and bank bag and received information

about the Respondent that he relayed to Detective Barney. Corporal Carr then went to 306 South Church to assist the Olathe Police Department in surveillance of that residence. After Corporal Carr arrived at 360 South Church Respondent came out of the house and left in a car with another man. An Olathe Police Department marked car driven by Officer David Biddulph followed the car in which Respondent was a passenger. Detective LaRue from the Olathe Police Department followed the marked car and Corporal Carr followed Detective LaRue. Detective Parker from the Johnson County Sheriff's Department was riding with Corporal Carr. The car in which Respondent was riding pulled into a gas station at which time the driver and Respondent were taken from the automobile. Detective LaRue, who was in charge of the surveillance at the scene and the stopping, and Detective Parker took Respondent from the car, searched him and arrested him for carrying a concealed weapon. No questions were asked of Respondent during the time he was being transported to the Olathe Police Station.

Lieutenant Larry Griffin of the Olathe Police Department was the sixth officer to testify. He was the duty watch commander in charge of the investigations at 943 North Iowa and 306 South Church on December 15, 1986. Lieutenant Griffin testified that he originally sent Officer Stover to 943 North Iowa to check on the well being of the people at that address. After receiving input from Officer Stover, Lieutenant Griffin's assessment was that they had a weapons violation against Respondent. Lieutenant Griffin had information about the Metro Squad investigation but directed his officers to act concerning the weapons violation and the welfare of the parties at 943 North Iowa and 306 South Church. Lieutenant Griffin advised Detective LaRue that he believed Respondent to be carrying a concealed weapon, that there were potentially innocent parties in the residence with Respondent and that the officers were to maintain surveillance. Lieutenant Griffin further directed his officers that in the event a person matching Re-

spondent's description attempted to leave the area, he was to be stopped to confirm the weapons violation and establish security for the area.

Officer David Biddulph of the Olathe Police Department was the seventh officer to testify. Officer Biddulph testified about the surveillance at 306 South Church. Officer Biddulph had been given Respondent's description and was advised that Respondent was armed with a revolver in his waistband or boot and that he possibly had drugs on his person. Detective LaRue advised Officer Biddulph that a suspect matching Respondent's description was leaving the scene in the passenger seat of an automobile and Biddulph was to follow the automobile and pull it over as soon as possible. Officer Biddulph testified that he was to stop and investigate the Respondent for carrying a firearm. Officer Biddulph made the stop and took the driver from the automobile as Detective LaRue had the Respondent exit the automobile. Officer Biddulph secured the driver and went around to the other side of the vehicle where Detective LaRue had the Respondent with his arms extended on the vehicle in a normal search. Officer Biddulph could see the bottom half of what appeared to be a holster in a cross draw position on the left side of Respondent's body underneath his jacket. Respondent was then arrested for carrying a concealed weapon.

Officer Biddulph further testified that a felony car stop, rather than a stop and search, is made when the police are confident an individual has committed a felony. The usual procedure for a felony car stop is to back off from the vehicle, order the individual out of the vehicle on a P.A. system, have the subject back toward the police or lie on the ground. The felony car stop procedure was not employed in the stopping of Respondent.

The last officer to testify was Detective Roger LaRue who, as previously stated, was with the Olathe Police Department. Detective LaRue testified that on December 15, 1986, he arrived at the Olathe Police Department at approximately 8:00 a.m. On his way to the station, Detective LaRue

heard a radio call about an investigation of a suspect who had been in the 900 block of North Iowa and was believed to have gone to a location on Church Street. When he arrived at the Station, Detective LaRue was advised that the subject of the call was armed, had been using drugs and that he might be related to an on-going murder investigation in Missouri. At that time Detective LaRue was not given a name for the subject but he was given a description.

Detective LaRue testified that he called the Jackson County Sheriff's Department and talked to Detective Barney telling him that the Olathe Police Department was "going to be investigating the incident because of the fact the guy was carrying a gun and supposed to be leaving." Detective LaRue told Detective Barney that if the Metro Squad had people available they might want to dispatch them to Olathe. Detective LaRue was not directed to arrest Respondent by the Jackson County officials or by Lieutenant Griffin.

Detective LaRue went to 306 South Church Street and was in charge at the scene when he arrived. Respondent, who fit the description that Detective LaRue had been given, came out of the house, got into a car and proceeded to leave the scene. Detective LaRue followed the Respondent, having decided to stop the car and then check and investigate to see if Respondent was carrying a firearm in violation of Kansas law.

Detective LaRue described the stopping of the vehicle and stated that he ordered Respondent out of the vehicle, had him place his hands on the hood and as the Respondent did so Detective LaRue noticed a brown leather holster sticking out from the bottom of Respondent's coat. Prior to searching Respondent, Detective LaRue observed a gun in the holster which was later determined to be a loaded .25 caliber automatic. Detective LaRue advised Respondent that he was under arrest for carrying a concealed weapon. Respondent was also subsequently charged with a drug violation.

After placing Respondent under arrest, Detective LaRue searched Respondent's person. The search produced .22 long rifle ammunition, a knife, a smoking pipe, a 35 millimeter film canister in which there was some white powder, a plastic bag of what was believed to be marijuana and identification papers of the victims of the Jackson County homicides. Detective LaRue testified that the procedure employed in the investigation and stop of Respondent was standard for the Olathe Police Department and that he was not acting for or being directed by the Metro Squad.

There was no further evidence presented and the trial court found that there had been a warrantless arrest after a search and that the arrest was a pretext designed to hold Respondent on the homicides for which he was subsequently charged in Missouri. The trial court ordered the handgun recovered from Respondent, the other evidence taken from his person and a subsequent videotaped statement to be suppressed. The State argues that the trial court erred in so holding.

On appeal by the State as authorized by § 547.200, RSMo 1986, the correctness of the trial court's decision is measured by whether the evidence is sufficient to sustain the findings. *State v. Blair*, 691 S.W.2d 259, 260 (Mo. banc 1985), *cert. dismissed*, 480 U.S. 698, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987); *State v. Cross*, 757 S.W.2d 613, 614 (Mo.App.1988). The Respondent, defendant below, did not present any evidence in this case and only the evidence presented can be considered in determining the facts and circumstances within the knowledge of the officers making the stop and arrest of Respondent.

The issue that presents itself is whether or not there was legal justification to stop and search the Respondent and arrest Respondent as well as to thereafter allow Respondent to be questioned regarding homicides unrelated to the offense for which he was originally arrested.

The landmark case of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), first recognized the right of police officers to make an investigation stop. In *Terry*, at p. 24, 88 S.Ct. at 1881, the United States Supreme Court also held that when an offi-

cer is justified in believing that the individual whose suspicious behavior he is investigating is armed and presently dangerous to the officer or to others, the officer has the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

Beyond the rulings of the United States Supreme Court the law of the state where an arrest without a warrant takes place determines its validity. *See, United States v. Di Re,* 332 U.S. 581, 589, 68 S.Ct. 222, 226, 92 L.Ed. 210 (1948); *State v. Morris,* 522 S.W.2d 93, 96 (Mo.App.1975).

Kansas Statutes Annotated Section 22–2402 as enacted in 1972, provides as follows:

"22–2402 STOPPING OF SUSPECT. (1) Without making an arrest, a law enforcement officer may stop any person in a public place whom he reasonably suspects is committing, has committed or is about to commit a crime and may demand of him his name, address and explanation of his actions.

(2) When a law enforcement officer has stopped a person for questioning pursuant to this section and reasonably suspects that his personal safety requires it, he may search such person for firearms or other dangerous weapons...."

The Kansas Supreme Court first discussed Section 22–2402 of the Kansas Statutes Annotated in *State v. Jackson,* 213 Kan. 219, 515 P.2d 1108 (1973), wherein the Kansas Supreme Court stated that their statute followed New York Statute law as approved by the United States Supreme Court in *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). 515 P.2d at page 1113 of its opinion in *Jackson,* the Kansas Supreme Court quoted the following from *Adams v. Williams,* 407 U.S. 143, 145–146, 92 S.Ct. 1921, 1922–1923, 32 L.Ed.2d 612 (1972):

"In *Terry* this Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause

to make an arrest....' The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time...."

The Kansas Supreme Court then stated that:

".... the 'stop' authorized by 22–2402 requires that a law enforcement officer must have prior knowledge of facts or observe conduct of a person which causes the officer to reasonably suspect that such person is committing, has committed, or is about to commit a crime. Further, in order to justify the search for weapons authorized under the provisions of subsection (2) of 22–2402, the officer must have prior knowledge of facts or observe conduct of the person ... which, in light of his experience, would cause the officer to reasonably suspect that his personal safety requires such search." 515 P.2d at 1113–14.

■ The United States Supreme Court has held that a reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop. *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). The stopping authority of the police implicitly includes forcible stopping. *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983).

The trial court found that the Respondent's arrest was a pretext designed to hold him for the homicide investigation. An arrest has been held to be a pretext when it is ostensibly for one purpose, but in reality is for the primary purpose of furthering an ulterior goal. *Warren v.*

*City of Lincoln, Nebraska,* 816 F.2d 1254, 1257 (8th Cir.1987), citing *United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932).[1]

■ The Olathe Police Department was conducting an investigation of the Respondent for carrying a concealed weapon in violation of Kansas law. Although the Olathe police were cooperating with the Metro Squad, as they should, the Olathe police were not conducting a homicide investigation or seeking primarily to further the homicide investigation of the Metro Squad. The Olathe Police Department was conducting its own separate investigation on the weapons violation. There is insufficient evidence to support the trial court's finding that the Respondent's arrest was a pretext.

In applying the legal principles as discussed herein to the detailed facts and circumstances reflected in the evidence, there can be no conclusion but that the Olathe Police Officers had a reasonable suspicion that Respondent was carrying a concealed weapon and the officers therefore had a statutory and constitutional right to stop the moving vehicle in which Respondent was a passenger. Once the officers stopped the Respondent they further had the statutory and constitutional right to search the respondent for firearms based upon a reasonable suspicion that their safety required such a search. Upon observing that the Respondent was in fact carrying a concealed weapon, his arrest on this charge was valid and not a pretext as argued by Respondent. Furthermore, the arrest of Respondent having been legal his questioning thereafter, subsequent to being given his Miranda warning, was not subject to suppression.

The trial court's order suppressing evidence is reversed and this cause is remanded with directions to admit the property seized from Respondent's person at the time of his arrest and further to admit the

statements made by the Respondent following his arrest.

All concur.

---

1. *See also, State v. Blair,* 691 S.W.2d 259 (Mo. banc 1985), *cert. dismissed,* 480 U.S. 698, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987), for a Missouri case which holds that an arrest may not be used as a pretext for an ulterior purpose.