STATE of Missouri, Plaintiff–Appellant,

v.

John R. WOODS,
Defendant–Respondent
(Two Cases).

Nos. 16691, 16693, 16784 and 16786.

Missouri Court of Appeals,
Southern District,
Division One.

May 23, 1990.

Martin Mazzei, Pros. Atty., Steelville, for plaintiff-appellant.

Arthur S. Margulis, Margulis & Grant, P.C., St. Louis, Dan L. Birdsong, Thomas, Birdsong, Clayton & Haslag, Rolla, R. Brooks Kenagy, Steelville, for defendant-respondent.

PARRISH, Judge.

John R. Woods (hereafter referred to as "defendant") is defendant in two criminal cases pending in the Circuit Court of Crawford County. He is charged in case number CR289-399FX with possession of more than 35 grams of marijuana, a controlled substance, § 195.020,[1] and in case number CR289-407FX with unlawful possession of a firearm silencer (Count I), § 571.020.1(5), and unlawful possession of a machine gun (Count II), § 571.020.1(2). Defendant moved in each of the cases to suppress certain evidence. The trial court, after evidentiary hearing,[2] sustained the motions in both criminal cases. The evidence that was suppressed was evidence seized from the premises of John R. Woods on May 30, 1989. "Said evidence includes but is not limited to marijuana, cocaine, drug paraphenalia [sic], weapons and ammunition of various descriptions and kinds." The State of Missouri filed interlocutory appeals from the trial court's suppression orders in the two criminal cases.[3] § 547.200. This court affirms.

The following parameters apply. Evidence obtained by an illegal search and seizure is not admissible against a defendant in a criminal case. U.S. Const. amend. IV; Mo. Const. art. I, § 15; *State v. Mercer*, 618 S.W.2d 1, 9 (Mo. banc), *cert. denied*, 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981); *State v. Venezia*, 515 S.W.2d 492, 493 (Mo. banc 1974); *State v. Sutton*, 454 S.W.2d 481, 484 (Mo. banc 1969). Evidence is inadmissible if illegally

obtained, directly or indirectly, as a consequence of lawless *official* acts as contrasted to evidence obtained from "independent source." *Peterson v. United States*, 411 F.2d 1074 (8th Cir.), *cert. denied*, 396 U.S. 920, 90 S.Ct. 247, 24 L.Ed.2d 199 (1969).

■ In reviewing the trial court's order suppressing the evidence in question, the facts and reasonable inferences therefrom are to be stated favorably to the order challenged on appeal. *State v. Blair*, 691 S.W.2d 259, 260 (Mo. banc 1985). The correctness of the trial court's decision is measured by whether the evidence is sufficient to sustain the findings. *Id.; State v. Cross*, 757 S.W.2d 613, 614 (Mo.App.1988).

Defendant and his wife own approximately 3,000 acres of land in Crawford County which they use for recreational purposes. There are several buildings on the property, including a house that defendant's family sometimes uses as "a weekend residence." Defendant allows friends to hunt on the acreage.

In 1986 defendant anticipated having guests hunting at his property during deer hunting season. Defendant was interested in having someone available to patrol his property during the deer hunting season to keep poachers off the property, "and to generally ensure order for my hunters." A conservation agent introduced Stanley Warner to defendant. Warner was a water patrolman and a commissioned deputy sheriff. Defendant hired Warner at a rate of compensation of $7.50 per hour to work during the 1986 deer hunting season. In 1987 defendant and Warner made the same arrangement.

In 1988 defendant purchased additional property. There was a house on the new property. Defendant inquired of Warner whether he would be interested in renting

---

1. All statutes cited are RSMo 1986 unless otherwise stated.

2. The motions in case numbers CR289-399FX and CR289-407FX were consolidated, by agreement of the parties, for evidentiary hearing by the trial court.

3. The State of Missouri filed interlocutory appeals to both the supreme court and this court.

The supreme court transferred the appeals filed with it to this court (Nos. 16784 and 16786). The two appeals transferred from the supreme court to this court are identical to the two appeals the State of Missouri took directly to this court (Nos. 16691 and 16693). This court consolidated the four cases on appeal.

the house. Defendant offered the house to Warner for $400 per month rent with an allowance of $200 per month for services which Warner would perform. The services would be performed throughout the year. Defendant had paid Warner "some $1,000 to $1,100" per year to assist during deer hunting season in 1986 and in 1987. The $2,400 credit on rent would pay for the same services Warner had previously provided during deer hunting season, "and the balance would be for the rest of the year, keeping an eye on the place." Warner accepted defendant's offer.

After the rental arrangement was made between defendant and Warner, Warner's duties remained similar to those he had been performing during deer hunting seasons. Defendant gave Warner keys to some of the buildings on the property, including keys to the residence (cabin) where defendant and his wife stayed when they were at the property. Defendant gave Warner authority to enter the cabin in the event of an emergency. Defendant did not show the cabin to Warner at that time. He had shown the cabin to Warner previously. At the time the cabin was shown to Warner, the doors to the bedrooms were closed. The rooms were identified as bedrooms, but Warner was not shown inside the rooms.

In late February or early March, 1989, defendant's wife called Warner and reported that a burglar alarm in the cabin had been activated. She had been notified about the alarm by a security company that monitors it. Warner went to the cabin and found that the alarm had been activated because the front door had blown open. He tried to shut off the alarm by entering a code in a keyboard which provides the controls for the alarm. That effort failed. Warner saw a note above the keyboard that said the shutoff was in the bedroom closet. He went to the cabin's master bedroom, found a grey metal box with a switch on its side, tried unsuccessfully to shut the alarm off there, then called the alarm company. Warner was told to just enter the code through the keyboard. After entering the code, "about four more times," the alarm stopped. Warner testified that dur-

ing the time he was in the closet attempting to shut off the alarm from the control box, he smelled what he believed was the odor of burnt marijuana. He did nothing about it then.

On May 12, 1988, Warner entered the cabin again. He had been given pieces of a telephone that had been converted to a lamp for delivery to defendant. He had previously left the items for defendant in a barn. After the items remained there for some time, Warner decided to take them to the house and leave them on a kitchen table. Warner testified that while he was in the kitchen, he looked across a breakfast bar at a tray and saw what he thought was a remnant of a marijuana cigarette, a "roach." He picked it up, ripped it open and, believing it to be marijuana, took a piece of brown paper bag from under a counter, wrapped it up and put it in a sandwich bag. He testified that he started to call defendant to report what he had found, but as he started to the telephone, he recalled the earlier occasion when he smelled what he thought was burnt marijuana in the closet to the master bedroom. Warner again went to the closet. He testified:

.  .  .  .  .

I have a really good nose for dope and so I just more or less sniffed it down to the chest of drawers and when I opened the center drawer in the chest of drawers there was a paraphernalia, a little bottle of seeds that I thought were Marijuana seeds, and there was rolling papers, rolled up bags of, plastic bags that had what I thought was residue Marijuana left in it.

He opened a medicine bottle that was in the drawer and found twelve hand-rolled cigarettes that he believed to be marijuana. He took nothing from the drawer, shut it, then left the cabin. Warner took the remains of the cigarette that he had seized from the counter in the kitchen. He placed that item in the evidence vault assigned for his use at the Crawford County Courthouse.

On May 15, the following Monday evening, Warner went back to the cabin. His purpose was to inspect the contents of the drawer he had previously inspected. He let himself in the front door with his key and went directly to the chest of drawers in the master bedroom closet, looked in the container where the twelve hand-rolled cigarettes had been and found "only ten left." He saw nothing else unusual in the cabin. He left, taking nothing from the cabin.

After May 15, Warner was away for four days attending a training program. Upon his return on May 19, Warner met with the chief deputy sheriff at a local restaurant and told the deputy sheriff about his observations. The chief deputy sheriff told Warner to "keep a handle on it." Warner was told by the chief deputy sheriff that a search warrant could be requested if it could be determined when the items believed to be marijuana cigarettes were disappearing. That same day Warner and the chief deputy sheriff met with the sheriff of Crawford County. The sheriff was told about Warner's observations.

After leaving the May 19 meeting with the sheriff, Warner planned again to enter the cabin. On May 29, after a holiday weekend, Warner again entered the cabin for purposes of determining whether or not more of the cigarettes had been smoked. While in the cabin on this occasion, Warner observed a balloon hanging from a small drawer in a piece of furniture in the living room of the cabin. Warner observed a residue of white powder in or on the balloon. He seized the balloon, then again entered the closet in the master bedroom and opened the drawer in the chest of drawers that he had previously examined. He did not again open the jar in which he previously found the hand-rolled cigarettes. Warner took the balloon that he had seized to the sheriff's office. Eventually, a laboratory analysis determined that the residue of white powder was not from a controlled substance.

On May 30, Warner and the chief deputy sheriff of Crawford County met with the sheriff and furnished the information that Warner had developed to the sheriff. Thereafter, the sheriff executed an affidavit to apply for a search warrant. Information that was provided by Warner was referred to in the affidavit as having come from a confidential informant. A search warrant was issued for purposes of searching the cabin on defendant's property. A search was conducted and various items seized. Following execution of the search warrant, criminal charges were filed against defendant. Thereafter, the suppression motions that the trial court ultimately sustained were filed.

The state asserts that the trial court erred in its findings whereby it granted the suppression motions. The state asserts the following points on appeal: (1) the trial court erred in finding defendant's expectation of privacy as to the contents of dresser drawers in the master bedroom and drawers in the living room of the cabin was reasonable and, in so finding, the court erred in its determination that, under the facts of this case, society is prepared to accept such an expectation of privacy; (2) the trial court erred in finding that Stanley Warner did not have authority to enter defendant's cabin at the times and in the manner that he did before a search warrant was issued; (3) the trial court erred in finding that Stanley Warner made warrantless searches of defendant's cabin on May 12, May 15, and May 29, and that he did not have permission nor consent of defendant or defendant's wife to do so; and (4) the trial court erred in finding that the "roach" was not specifically referred to as to time, date or place in the affidavit for search warrant and that the affidavit was insufficient to show probable cause to issue a search warrant. These points on appeal will be referred to as points 1, 2, 3 and 4; however, they will not necessarily be discussed in that order.

The trial court entered a written Order Ruling on Motion to Suppress Evidence in both criminal cases. In those orders, the trial court set forth various findings in support of its determination that the evidence seized from the premises in question on May 30, 1989, be suppressed. The trial court's findings included the following.

Stanley Warner was a member of the Missouri Water Safety Patrol and a deputy sheriff of Crawford County, Missouri, and Warner worked "as a watchman and/or caretaker for the Defendant." At all times relevant to the motions, Warner was employed to safeguard defendant's property and "was to enter the building which served as the residence of John and Judy Woods only in emergencies or at the specific instance and request of Defendant, John R. Woods, or his wife." Stanley Warner "exceeded his authority as watchman and/or caretaker at the time of making entries into the home on the initial occasion where he allegedly was answering a burglar alarm and also on May 12, May 15 and May 29, 1989." Stanley Warner "entered the Woods' premises on May 12, May 15 and May 29, 1989, for the purpose of conducting a criminal investigation and made warrantless searches of the Woods' master bedroom closet May 12 and May 15, 1989, and a warrantless search of a drawer in the living room of the Woods' residence on May 29, 1989.... Warner collected evidence which he kept in an evidence locker at the Crawford County Sheriff's Office, that he made the Sheriff's Office aware of his activities and that the Sheriff's Office had full knowledge of and acquiesced in his activities." The trial court further found "that the Sheriff and the Chief Deputy Sheriff of Crawford County met with Stan Warner on May 19, 1989, and obtained a full report on his activities and acquiesced in his further investigation."

Based upon all of the findings set forth in the orders entered in the criminal cases, the trial court found "that the entries and searches and seizures of Stan Warner made on May 12, May 15 and May 29, 1989, were illegal and violative of the Defendant's rights under the United States Constitution and the Missouri Constitution." The trial court made a specific determination that defendant had a reasonable expectation of privacy as to the cabin "and that he had the highest kind of expectation of privacy as to the contents of the dresser drawers in his master bedroom closet and further had a reasonable expectation of privacy in the drawers in the living room."

The trial court concluded that the affidavit given by the sheriff seeking a search warrant was based upon the information provided by Warner, who that affidavit listed as a "confidential informant," even though Warner was a law enforcement officer at the time he supplied information to the sheriff and that the "probable cause" relied upon for purposes of issuing the search warrant in question consisted of evidence from illegal searches and seizures conducted by Warner. The trial court further noted in its orders that "the only specifically described and identified search supplying probable cause was the search of May 29, 1989, which was warrantless."

■ In order for the Fourth Amendment to apply, the search complained of must be at the behest of the government, i.e., it must be done by a government official acting in an official capacity. The Fourth Amendment offers protection from lawless official acts, not from acts of private individuals. *Peterson v. United States, supra,* at 1078. Warner's primary occupation was law enforcement officer. His employment by defendant was independent of his law enforcement responsibilities. "An off duty policeman is not automatically acting in concert with or at the direction of government officials simply because he discovers contraband." *State v. Castillo,* 108 Idaho 205, 207, 697 P.2d 1219, 1221 (App.1985), citing *United States v. McGreevy,* 652 F.2d 849 (9th Cir.1981), and *State v. Pearson,* 15 Or.App. 1, 514 P.2d 884 (1973). "[O]fficial involvement is not measured by the primary occupation of the actor, but by the *capacity* in which he acts at the time in question." *Id.,* 15 Or.App. at 6, 514 P.2d at 886 (emphasis in original), cited in *State v. Castillo, supra.*

Defendant testified that Warner had authority to go into the cabin only in emergency situations and that this limitation was conveyed to defendant. He specifically stated that Warner was never given authority to enter the master bedroom in the cabin nor to "go into the dresser drawers in that closet." Defendant's wife testified that she never authorized Warner to enter the master bedroom in the cabin nor

the closet in that bedroom; that she never authorized him access to the chest of drawers in that closet; and that she did not know Warner had been in the closet, bedroom, and chest of drawers. When asked what she would have done if she had known that Warner had been going into those places, Mrs. Woods replied, "I would have fired him, or at least have, tell my husband to." She stated, "That's private."

Two issues are central to a determination of this appeal. First, were Warner's actions taken in such circumstances that they constitute actions by a law enforcement officer or actions of a private individual? Second, did defendant have a legitimate and reasonable expectation of privacy as to the areas of the cabin where Warner searched?

On May 12, 1989, Warner entered the closet in the master bedroom at the cabin and looked inside a chest of drawers there. He saw what he believed to be a controlled substance and drug paraphernalia. He went back to the premises May 15 and looked in the chest of drawers again. He did not report his observations to defendant. He did not call another law enforcement officer to the scene. He waited until his return from a four-day law enforcement seminar, on May 19, then he met first with the chief deputy sheriff of Crawford County and later that same day with both the chief deputy and the sheriff and discussed his observations. Defendant was not contacted. Rather, Warner was instructed by the chief deputy sheriff to "keep a handle on it." On May 29, Warner again entered the cabin and seized an item he believed to be evidence.

■ The trial court found that Warner entered the cabin on May 12, May 15 and May 29 for purposes of conducting a criminal investigation and made warrantless searches of areas and furniture in the cabin (the master bedroom closet, on May 12 and 15 and a drawer in the living room on May 29). By not reporting his suspicions nor otherwise contacting defendant, Warner demonstrated that he was not acting on *defendant's behalf*. By not calling another law enforcement officer to the scene and by continuing to enter the cabin and search, suspecting criminal conduct, Warner conducted a criminal investigation. By entering the closet in the master bedroom and searching a drawer in furniture in that closet on May 12, and by subsequent entries into the cabin on May 15 and May 29, Warner went beyond any initial mission for defendant for which he may have first entered the cabin. By so doing, and by subsequently seizing items which he kept for evidence, Warner acted in his capacity as a law enforcement officer rather than exclusively as defendant's "watchman and/or caretaker."

Warner's conduct was similar to that of the deputy sheriff's conduct in *United States v. Clarke*, 451 F.2d 584 (5th Cir. 1971). In *Clarke* a defendant's son-in-law was a deputy sheriff. The son-in-law was requested by that defendant's stepmother to go to the defendant's home, in the defendant's absence, for purposes of getting certain stock certificates owned by the defendant's father and forwarding those stock certificates. The deputy sheriff in *Clarke* had a key to the defendant's property which the defendant had given him previously. While in the house, the deputy sheriff undertook to look behind a mirror where he discovered stolen bonds. He removed the bonds, photocopied them, and returned the originals. At trial an FBI agent and the deputy sheriff testified concerning the bonds and the copies provided by the deputy sheriff. The court, in *Clarke*, held that the deputy sheriff undertook the search in his capacity as a law enforcement officer without a warrant and that the search was, therefore, illegal.

Similar searches by off-duty law enforcement officers have been determined to constitute "official" actions and be unlawful. *Ex Parte Kennedy*, 486 So.2d 493 (Ala. 1986); *State v. Wilkerson*, 367 So.2d 319 (La.1979).

In *Wilkerson* a defendant who had worked at an apartment complex was told where he could store his luggage. The luggage was placed in a vacant apartment. An off-duty deputy sheriff who worked as a security guard at the apartment complex

got permission from the apartment manager to search the luggage. The court held the deputy sheriff was acting in his capacity as a deputy sheriff at the time he conducted the search.

In *Kennedy* an off-duty policeman working as an exterminator took a leaf for analysis from a plant in a home where he was working. The off-duty policeman suspected that the plant was marijuana. Laboratory analysis confirmed that the plant was marijuana. The court held that the off-duty policeman used knowledge and skill from his experience and training as a police officer in spotting the marijuana; that he stepped out of his exterminator role and became a government agent when he seized the leaf. The court, in *Kennedy*, cited *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), for the proposition that the Fourth Amendment applies if a person, in light of all the circumstances in the case, may be regarded as an instrument or agent of the state.

Here, according to his testimony, Warner's initial entry in the cabin in late February or early March was for a purpose unrelated to his primary occupation as a law enforcement officer. Likewise, according to Warner's testimony, his purpose for entering the cabin on May 12 was for a purpose unrelated to his law enforcement duties. His first entry was for the purpose of shutting off an activated burglar alarm; the second to leave parts to a lamp where defendant could find them. Once inside the cabin on May 12, however, Warner's actions took on a new purpose. Having discovered remnants of what he believed to be a marijuana cigarette, Warner acted in a manner similar to the off-duty police officer in *Kennedy*. Warner recalled smelling an odor which he had believed to be burnt marijuana when he had been in the closet to the master bedroom of the cabin more than three months before. Warner used the knowledge and skill from his experience and training as a law enforcement officer in his foray once again into the master bedroom closet. This time he used his "really good nose for dope" and "sniffed it down to the chest of drawers." He did not stop at that point. Rather than

make a report to an appropriate other law enforcement officer or law enforcement agency, Warner conducted a search of the drawer to which he had "sniffed" the suspicious odor. As in *Clarke*, Warner undertook a criminal investigation in entering the closet and searching the chest of drawers and in his subsequent actions.

As in *Kennedy*, Warner's suspicions were aroused based upon experiences and training he had as a law enforcement officer. As in *Wilkerson*, Warner proceeded beyond his duties as a watchman or caretaker by searching areas he was not otherwise authorized to enter. The extent to which Warner went in his criminal investigation is highlighted by the disposition he made of the remnants of what he thought was a marijuana cigarette. He seized the remnants and placed them in the evidence locker assigned to him as a law enforcement officer.

In these circumstances, Warner's actions on May 12 and thereafter were such that they constitute actions as a law enforcement officer. The trial court's determination that Warner made warrantless searches of defendant's cabin on May 12, May 15 and May 29, and that he did not have permission nor consent of defendant or defendant's wife to do so, is supported by the evidence. The evidence is sufficient to sustain the finding of the trial court. The state's second and third points on appeal fail.

■ The other issue central to this appeal relates to defendant's expectation of privacy as to the areas of the cabin Warner searched. As previously noted, the trial court concluded that defendant had the highest kind of expectation of privacy as to the contents of the dresser drawer in the master bedroom closet and had a reasonable expectation of privacy as to drawers in furniture in the living room of the cabin. As pointed out by the state, the Fourth Amendment protects people, not places. This principle is recognized in *State v. Nichols*, 628 S.W.2d 732, 735 (Mo.App. 1982), which states, quoting from *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct.

2547, 65 L.Ed.2d 619 (1980), and *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978):

"While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, see *Rakas*, supra, 439 U.S. at 144, n. 12, 99 S.Ct., at 431, property rights are neither the beginning nor the end of this Court's inquiry. In *Rakas*, this Court held that an illegal search only violates the rights of those who have 'a legitimate expectation of privacy in the invaded place.'" *Salvucci*, 100 S.Ct. l.c. 2553. Finally, in *Salvucci*, 100 S.Ct. at 2553, the Court said: "We simply decline to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched."

*Nichols* further discussed what constitutes a "legitimate expectation of privacy" in the area searched, stating:

"[A] 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, *but it is not one which the law recognizes as 'legitimate.'* His presence, in the words of *Jones* [*v. United States*], 362 U.S., [257] at 267, 80 S.Ct., [725] at 734, [4 L.Ed.2d 697] is 'wrongful', his expectation is not *'one that society is prepared to recognize as "reasonable."'* *Katz v. United States*, 389 U.S., [347] at 361, 88 S.Ct., [507] at 516 [19 L.Ed.2d 576] (Harlan, J., concurring).... Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns or *lawfully* possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest. These ideas were rejected both in *Jones*, supra, and *Katz*, supra. But by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment." *Rakas*, supra, 99 S.Ct. at 430–431. (Emphasis added.)

*Id.*

Defendant's wife, as stated previously, testified that she would have fired Warner as "watchman and/or caretaker" had she known he was entering her bedroom, her bedroom closet, and going through drawers of furniture in the cabin. She stated, "That's private." Defendant testified that he kept personal items in the drawers in the furniture Warner had looked through. Defendant testified that if he had known Warner was going through drawers in the cabin, he would have asked Warner to leave, "Pack his bags and leave." As noted in *Kennedy, supra*, at 495, there is a significant expectation of privacy in a residence.

Defendant owned the property Warner searched. He used it as a weekend residence. His presence at the cabin and its use as a place to keep personal belongings was not "wrongful." He had the right to exclude others from that property. His expectation of privacy in the cabin was legitimate. The trial court found that the defendant "had the highest kind of expectation of privacy as to the contents of the dresser drawer in his master bedroom closet and further had a reasonable expectation of privacy in the drawers in the living room." The evidence is sufficient to support that finding. Defendant had a legitimate expectation of privacy in the areas searched. That expectation of privacy was reasonable by societal norms. The state's first point on appeal fails.

■ The state's fourth point also fails. The information obtained and used by the sheriff of Crawford County in his affidavit to secure a search warrant was the product of illegal searches conducted by Warner in Warner's capacity as a law enforcement officer. Although a search warrant was issued May 30, the evidence seized as a result of the execution of that search warrant was gained as a result of Warner's prior illegal searches and is, therefore, tainted and inadmissible. *Peterson v. United States, supra.* The affidavit the sheriff gave for purposes of obtaining the search warrant referred solely to observations related to him by a "confidential informant," Stanley Warner. The affidavit stated it was based upon the observations of the "confidential informant" made May 29, 1989. The trial court's finding that a marijuana remnant, a "roach," was not referred to as to time, date or place in the affidavit for a search warrant is supported by the evidence. The reference in the affidavit to observations "[t]hat the informant [Warner] further told your affiant [the sheriff] that he had observed cocaine, marihuana, and drug paraphernalia, in the aforementioned residence on at least one prior occasion," without further specificity, does not supply probable cause. *Sgro v. United States,* 287 U.S. 206, 211, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932); *United States v. Chesher,* 678 F.2d 1353, 1362–63 (9th Cir.1982); *Poldo v. United States,* 55 F.2d 866, 868 (9th Cir.1932); *Kohler v. United States,* 9 F.2d 23, 25 (9th Cir.1925); *Staker v. United States,* 5 F.2d 312, 314 (6th Cir.1925).

The orders of the trial court sustaining the defendant's motions to suppress evidence filed in case numbers CR289–399FX and CR289–407FX are supported by sufficient evidence. The orders of suppression entered in those cases are affirmed.

CROW, P.J., and PREWITT, J., concur.